IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
ASSIGNED ON BRIEFS DECEMBER 14, 2007

# R. LINLEY RICHTER, JR. v. SEYMOUR S. ROSENBERG

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-003463-02      Robert L. Childers, Judge**

---

**No. W2007-01486-COA-R3-CV - Filed May 20, 2008**

---

This appeal involves a dispute between two attorneys over a contingency fee generated from a client's case. The younger attorney worked as an associate at the senior attorney's law firm, and both parties worked on the client's case. When the case concluded, the associate sued the senior attorney, claiming that the parties had agreed to equally share the fee. The senior attorney testified that the associate had volunteered to work on the case for free. He further testified that pursuant to the parties' arrangement, if he chose to pay the associate, he could unilaterally decide how much the associate's services were worth. The trial court found that the parties had agreed to equally share the attorney's fee generated in the case, and it awarded the associate one-half of the fee. For the following reasons, we affirm the trial court's decision.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Scott B. Ostrow, Memphis, TN, for Appellant

Martin W. Zummach, Germantown, TN, for Appellee

**OPINION**

# I. FACTS & PROCEDURAL HISTORY

Linley Richter, Jr. began clerking for Seymour Rosenberg, a practicing attorney, in March of 1990, during Mr. Richter's second year of law school. After Mr. Richter graduated and passed the bar exam, he was offered a position as an associate attorney at Mr. Rosenberg's law firm. Mr. Richter accepted the position in April of 1992. That same month, one of Mr. Rosenberg's long-time clients, who will be referred to as "Client,"[1] came into the office and requested that Mr. Rosenberg file a lawsuit on his behalf. Mr. Richter investigated the claim and filed a complaint, and he continued to work on the case over the next several years along with Mr. Rosenberg. The case eventually produced an attorney's fee of approximately $887,000, and Mr. Richter received $10,000 from that amount. Mr. Richter filed this lawsuit against Mr. Rosenberg alleging, relevant to this appeal, breach of contract and conversion. Mr. Richter claimed that he was entitled to one-half of the attorney's fee.

The trial court held a two-day bench trial. Mr. Rosenberg and Mr. Richter presented conflicting testimony regarding their fee arrangement and their involvement in Client's case. Mr. Richter was not paid any type of salary. According to Mr. Richter, in any case he handled, he owed Mr. Rosenberg 50% of the attorney's fee the case produced. He explained that the parties would split the fee regardless of whether he "brought the case in," or whether it originated with Mr. Rosenberg and was then assigned to Mr. Richter. Mr. Richter testified that after Client came to discuss his case in April of 1992, Mr. Rosenberg told Mr. Richter to handle the case and that they would split the fee "50/50."

Mr. Rosenberg similarly testified that the parties split the attorney's fee in any cases that Mr. Richter worked on, whether they were "generated by" Mr. Richter, or cases that involved Mr. Rosenberg's clients and were given to Mr. Richter to handle. However, Mr. Rosenberg also testified about a third scenario. According to Mr. Rosenberg, if he opened a file and handled the case himself, he received 100% of the fee. If an associate helped him with a task in those cases, Mr. Rosenberg said that he would pay the associate an amount he deemed fair, such as $100 for taking a deposition. He claimed that Mr. Richter was only entitled to 50% of the fee if he handled the case "to a completion." Mr. Rosenberg claimed that Client's case fell under this third scenario, and he was not obligated to pay Mr. Richter anything for working on Client's case. Mr. Rosenberg acknowledged that he could not recall any other case in which the parties had operated under such an arrangement.

Mr. Rosenberg further testified that after Client initially came in to discuss his case, Mr. Richter asked if he could help Mr. Rosenberg on the case for free in order to gain experience. According to Mr. Rosenberg, he accepted Mr. Richter's help, but told him, "if we win, I'll see that you get some money." Mr. Rosenberg testified that Client's case was the only one that Mr. Richter agreed to work on for free. At trial, Mr. Richter was asked if he volunteered to work for free, and he responded, "Absolutely not."

---

[1] Because of a confidentiality agreement, we will not refer to the client by name or discuss the details of the client's underlying case.

In any event, Mr. Richter began to research and investigate Client's case soon after the parties' discussion. Mr. Rosenberg's law firm maintained a journal, and it reflected that Mr. Richter "opened a file" on Client's case in 1992. Mr. Richter testified that he interviewed Client on several occasions and performed a tremendous amount of research on the case. He drafted a six-count complaint without any guidance from Mr. Rosenberg as to which causes of action to allege. Mr. Richter then went over the complaint with Client and Mr. Rosenberg, both attorneys signed it, and the complaint was filed in June of 1992. Several dispositive motions were filed before the answer, and Mr. Richter responded to those motions himself. Mr. Richter testified that he was not aware of any contact between Mr. Rosenberg and the opposing counsel in Client's case. Mr. Richter prepared the written discovery in the case and took most of the depositions. Mr. Richter argued against the defendant's motion for interlocutory appeal, which was ultimately denied. Mr. Richter was also authorized by Client to attempt to settle the case.

Mr. Richter testified that Mr. Rosenberg had such little involvement in the case, Client became frustrated with Mr. Rosenberg and threatened to seek representation elsewhere. On April 20, 1994, Client signed a letter containing a fee agreement, which altered the terms of the original contingency fee arrangement. The agreement provided:

> This letter will confirm our agreement to represent you in the above styled cause on a contingency fee of one-third (1/3) of the actual damages and one-half (1/2) of punitive damages if One Million Dollars ($1,000,000.00) or over, or in the alternative one-third (1/3) if less than One Million Dollars of punitive damages. You will also pay the case expenses incurred in this matter.
> If this meets with your approval, please sign the bottom of this letter and return same to our office.

The agreement was written on letterhead listing Mr. Rosenberg's name and Mr. Richter's name at the top, but only Mr. Rosenberg signed the letter. According to Mr. Richter, this agreement was entered into when Client expressed his dissatisfaction with Mr. Rosenberg's involvement in the case. Mr. Richter explained that Mr. Rosenberg had no incentive to get involved in the case because he would be receiving 50% of the attorney's fee if he did nothing and Mr. Richter handled it himself. Mr. Richter stated that by increasing the potential fee, Mr. Rosenberg was motivated to become involved in the case, and Client was satisfied by Mr. Rosenberg's increased attention. Mr. Richter testified that he continued to work on the case, but Mr. Rosenberg attended depositions with him and took a more active role in the case. Mr. Richter stated that before trial, Client specifically requested that Mr. Rosenberg question the witnesses at trial. Mr. Richter also explained that this was the only case in which he and Mr. Rosenberg "served together," and usually he and Mr. Rosenberg worked on cases alone.

Mr. Rosenberg presented a different account of his involvement in Client's case. He testified that although he "gave the menial tasks out," he did the major work, such as finding ways to win the

case. He acknowledged that Mr. Richter drafted the complaint, filed all the pleadings, responded to the motions to dismiss, attended every hearing, handled written discovery, and took the vast majority of the depositions in the case. Mr. Rosenberg testified that he had no idea how many hours he or Mr. Richter spent working on the case, and he could not estimate who spent more time on the case. Mr. Rosenberg also gave a different explanation of the fee agreement that was executed in April of 1994. Mr. Rosenberg claimed he prepared the fee agreement simply because Client had never signed a fee agreement regarding his case. Although the fee agreement discussed "our agreement to represent you," Mr. Rosenberg testified that the word "our" referred to him and Client.

A four-day trial of Client's case was held in March of 1996. Mr. Rosenberg gave opening and closing statements and examined thirteen witnesses. Mr. Richter examined one witness. Both parties testified that they acted as a "trial team" during the trial. Mr. Rosenberg claimed that Mr. Richter's involvement was limited to defending Client against a counterclaim, but Mr. Richter testified that he also generally participated in the trial by "fielding" objections, arguing to the court, and suggesting that Mr. Rosenberg ask the witnesses certain questions. After the trial concluded, the judge took the matter under advisement for over a year.

On October 17, 1996, while Client's case was still under advisement, Mr. Rosenberg and Mr. Richter entered into a contract. Mr. Richter agreed to begin paying rent for the continued use of his office, and he agreed to pay for his share of the utilities and office supplies. He also agreed to pay one-half of their secretary's salary. The contract further provided, in pertinent part:

> It is further agreed that in addition to the above terms, R. Linley Richter, Jr. shall pay to Seymour S. Rosenberg the sum of $1,000.00 each and every month as additional rent, which amount shall represent the remaining equity in those files currently handled by R. Linley Richter, Jr. . . . Said payments to continue through the month of November, 1998.
> It is further agreed that R. Linley Richter, Jr. shall continue to handle all workers' compensation clients originating with Seymour S. Rosenberg or R. Linley Richter, Jr. If any subsequent file originates with Seymour S. Rosenberg but is later turned over to R. Linley Richter, Jr. for handling, then any attorney fees generated on such file shall be divided equally between R. Linley Richter, Jr. and Seymour S. Rosenberg unless a different amount is agreed to in writing.
> This agreement is entered into by and between Seymour S. Rosenberg and R. Linley Richter, Jr. on this the 17th day of Oct[ober], 1996, and replaces and supersedes any and all previous agreements and becomes effective retroactive to September 1, 1996.

In August of 1997, the trial judge awarded Client over $250,000 in compensatory damages. The parties then began preparing for the second phase of the trial regarding punitive damages. Mr.

Rosenberg testified that he handled the punitive damages phase of the trial, and although Mr. Richter was present at the hearing on punitive damages, he did not participate or "have anything to do with the proceedings." Again, Mr. Richter testified to the contrary. According to Mr. Richter, he prepared discovery for the punitive damages phase of the trial, drafted the pleadings, and took part in the hearing. Mr. Richter introduced a document filed prior to the punitive damages hearing containing interrogatories and requesting the production of documents regarding punitive damages, which Mr. Richter had signed as one of the "Attorneys for Plaintiff." He also filed the transcript of the punitive damages hearing, which reflects that Mr. Rosenberg examined the three witnesses, but Mr. Richter responded to some objections and otherwise addressed the court before and after the hearing.

The trial judge awarded Client several million dollars in punitive damages. The defendant appealed to the Tennessee Court of Appeals and eventually the Tennessee Supreme Court. Mr. Rosenberg and Client entered into an agreement with another law firm whereby the other firm would handle the appeals process in exchange for a portion of the eventual recovery. Mr. Richter admitted that he was not involved with the case on appeal because it was handled by the other law firm.

The Supreme Court eventually affirmed the compensatory damage award, but remanded the punitive damages issue for further proceedings. The defendant paid Client for the compensatory damage award, and the attorney's fee received by Mr. Rosenberg amounted to approximately $87,000. Mr. Rosenberg gave $10,000 of that amount to Mr. Richter in June of 2001. Again, the parties presented drastically different testimony about the circumstances surrounding this payment. Mr. Rosenberg testified that he gave Mr. Richter the $10,000 check without incident, and he told Mr. Richter that he would give him more money when the punitive damage award was received. He claimed that Mr. Richter did not seem upset or question the amount he was given. According to Mr. Rosenberg, it was "strictly gratuitous" on his part to pay Mr. Richter $10,000 because he did not have to pay him anything. Mr. Richter, on the other hand, testified that he was "livid" and "devastated" when Mr. Rosenberg brought in the $10,000 check representing his portion of the fee from the compensatory damage award. Mr. Richter testified the parties got into a heated argument over whether he was entitled to half the attorney's fee, and Mr. Rosenberg denied the parties had ever agreed to split the fee. Mr. Richter testified the parties had four or five discussions about the fee arrangement, and he said that he even prepared a proposed agreement attempting to resolve the situation. However, Mr. Rosenberg kept insisting that he did not owe Mr. Richter any portion of the fee, though he said he intended to pay him something gratuitously. Mr. Rosenberg testified that when Mr. Richter did eventually claim he was entitled to half the attorney's fee, he replied, "you've got to be kidding me."

In the spring of 2002, Mr. Rosenberg attended a mediation without Mr. Richter, and the parties settled the issue of punitive damages. Mr. Rosenberg received $800,000 for the attorney's fee. Mr. Richter somehow learned of the settlement, and he approached Mr. Rosenberg in June of 2002 to inquire about the status of the case. According to Mr. Richter, Mr. Rosenberg told him the case had not settled, and there would be another hearing, which could mean it would be two more years before they received a judgment. Mr. Rosenberg testified he told Mr. Richter "it's close" to

settling, because although the parties had actually settled on a figure, the opposing party threatened to stop payment on the checks, so the settlement was not actually completed. . Mr. Richter filed suit shortly after that conversation.

Client also testified at trial, and he stated that he considered Mr. Richter as one of his lawyers. He testified that Mr. Richter took most of the depositions in his case, and Mr. Rosenberg usually was not present. Client also testified that Mr. Rosenberg presented the new fee agreement when "he realized that we did have a good lawsuit finally."

Another attorney also testified at trial, Mr. John Raspberry, Jr., who was working at Mr. Rosenberg's law firm when Client's case settled. Mr. Raspberry was not involved in Client's case, but he knew about the settlement. Mr. Raspberry testified that he had two conversations with Mr. Rosenberg about the dispute with Mr. Richter. First, Mr. Raspberry described a telephone conversation he had with Mr. Rosenberg, during which Mr. Rosenberg instructed him not to speak with Mr. Richter about Client's case. According to Mr. Raspberry, Mr. Rosenberg said "he knew he owed him money, but he wasn't going to pay him half." In a later conversation, Mr. Rosenberg again instructed Mr. Raspberry not to talk with Mr. Richter, and Mr. Raspberry told Mr. Rosenberg that he did not want to be involved in the dispute.

The trial court entered a five-page memorandum opinion and order on March 28, 2007, finding in favor of Mr. Richter. The order included extensive findings of fact, which included the following:

> . . . Richter became fully licensed to practice law in April, 1992. Rosenberg and Richter then entered into an oral agreement that Rosenberg would receive fifty percent (50%) of the attorney's fee in any case that Richter brought into the office and fifty percent (50%) of the fee in any of Rosenberg's cases that Rosenberg assigned to Richter to handle. Under the agreement Richter was to receive nothing on Rosenberg's cases that Rosenberg handled alone.
> Sometime in May or June, 1992[,] Rosenberg was contacted by a longstanding client of Rosenberg's, [Client], about filing a lawsuit for [him] . . . . Rosenberg talked to Richter about the case and asked Richter to work on the case and that Rosenberg would split the fee with Richter equally. Richter agreed to the offer and immediately began working on the case. . . .
> . . . [Client] and Rosenberg entered into a new written agreement, dated April 20, 1994, that provided "this letter will confirm *our (emphasis added)* agreement to represent you . . . ." The "our" in the April 20, 1994 agreement referred to Rosenberg and Richter.
> . . .
> On or about October 17, 1996, Rosenberg and Richter entered

into another agreement. . . .

The October 17, 1996 agreement covered three types of cases:
1) Cases "currently being handled by R. Linley Richter, Jr.";
2) "All workers' compensation clients originating with Seymour S. Rosenberg, or R. Linley Richter, Jr.", and;
3) "Any subsequent (to October 17, 1996) file originating with Seymour S. Rosenberg, but later turned over to R. Linley Richter, Jr. for handling."

[Client's] case was not included in the October 17, 1996 agreement. It was not a workers' compensation case, nor was it a case that originated subsequent to the October 17, 1996 agreement. It was a hybrid case not covered by the agreement. It was Rosenberg's case that he asked Richter to work on and in return Rosenberg agreed to pay Richter one-half of any attorneys fees realized on the case. . . .

Witness John Quitman Raspberry, Jr.'s testimony provides further evidence that [Client's] case was not included in the October 17, 1996 agreement. Raspberry testified that he had two conversations with Rosenberg about the fee dispute between Rosenberg and Richter. . . . Rosenberg told Raspberry that he (Rosenberg) knew that he owed Richter money on the case, but Rosenberg was not going to pay Richter one-half. . . .

. . .

Rosenberg's trial testimony provides further evidence that [Client's] case was not a part of the October 17, 1996 agreement. Rosenberg testified that he was going to pay Richter an additional $15,000.00 for Richter's work shortly before Richter filed his lawsuit on June 19, 2002, but Rosenberg testified that he changed his mind after Richter filed the lawsuit.

. . .

The trial judge concluded that Mr. Rosenberg breached the parties' oral contract whereby he agreed to pay Mr. Richter one-half of the attorney's fee in exchange for Mr. Richter working on the case. The court awarded Mr. Richter one-half the attorney's fee, minus the $10,000 he was paid, for a total of $433,619.95, plus pre-judgment interest at the statutory rate from the date his complaint was filed, which was June 19, 2002. The court also found that Mr. Richter had failed to prove conversion.[2] Mr. Rosenberg filed a motion to alter or amend, which was denied. He then filed a timely notice of appeal to this Court.

---

[2] The trial court further found that Mr. Rosenberg fraudulently concealed the settlement of Client's case and intentionally misrepresented to Mr. Richter that it had not settled. However, the court stated that no additional damages were caused by the fraudulent concealment or intentional misrepresentation.

## II. ISSUES PRESENTED

Mr. Rosenberg presented three separate issues for review, which we restate as: Whether the trial court committed reversible error by awarding Mr. Richter fifty percent of the fee, thereby failing to enforce either the 1992 agreement or the 1996 agreement.

In addition, Mr. Richter presents the following issue for review:

Whether the trial court erred by finding that each and every element of conversion existed in this case, then ruling that Mr. Rosenberg was not guilty of conversion.

For the following reasons, we affirm the judgment of the circuit court.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2007); ***Bogan v. Bogan***, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. ***Watson v. Watson***, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. Breach of Contract

We will first address Mr. Rosenberg's contention that the trial court erred by ignoring the original 1992 agreement between the parties. In his brief, Mr. Rosenberg sets out three components of the oral agreement, which he testified to at trial, and he claims that the trial court simply refused to apply that agreement and substituted its judgment for that of the parties. However, Mr. Rosenberg fails to recognize or even mention that his testimony about the 1992 agreement was very different from Mr. Richter's testimony.

Mr. Richter testified that in any cases he handled, the parties would split the attorney's fee regardless of whether he generated the case or it originated with Mr. Rosenberg and was then assigned to Mr. Richter. Likewise, Mr. Rosenberg acknowledged that under the original agreement, the parties would equally share the attorney's fee "on cases Richter worked on," whether he had given the case to Mr. Richter or Mr. Richter had developed it himself. However, Mr. Rosenberg also

testified inconsistently about a third possibility under the agreement. First, Mr. Rosenberg stated that if he generated a client, opened the file himself, and handled the case himself, he retained 100% of the attorney's fee; however, he said if an associate "[did] some little things for me like take a deposition," he might have paid the associate what he thought it was worth. Later, Mr. Rosenberg testified that Mr. Richter could only receive 50% of the attorney's fee in cases he had been assigned if he handled the case "to a completion." If Mr. Richter did not handle the case to completion, Mr. Rosenberg claimed that he could unilaterally decide what Mr. Richter's services were worth. Mr. Rosenberg classified Client's case as falling under this third scenario, but he did not know of any other cases in which he had unilaterally determined the value of Mr. Richter's services.

Mr. Richter testified that when he was assigned Client's case, Mr. Rosenberg specifically told him they would split the fee it produced "50/50." Mr. Rosenberg, on the other hand, testified that Mr. Richter asked to work on the case for free so that he could gain experience. The trial court made the following findings about the 1992 agreement:

> Rosenberg and Richter then entered into an oral agreement that Rosenberg would receive fifty percent (50%) of the attorney's fee in any case that Richter brought into the office and fifty (50%) of the fee in any of Rosenberg's cases that Rosenberg assigned to Richter to handle. Under the agreement Richter was to receive nothing on Rosenberg's cases that Rosenberg handled alone.
> Sometime in May or June, 1992[,] Rosenberg was contacted by a longstanding client of Rosenberg's, [Client], about filing a lawsuit for [him] . . . . Rosenberg talked to Richter about the case and asked Richter to work on the case and that Rosenberg would split the fee with Richter equally.

Obviously, the trial judge accredited Mr. Richter's testimony and accepted his version of the 1992 agreement. When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. ***Machinery Sales Co., Inc. v. Diamondcut Forestry Prods., LLC***, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002); *see also* ***Bryant v. Baptist Health Sys. Home Care of East Tenn.***, 213 S.W.3d 743, 750 (Tenn. 2006). The weight, faith, and credit to be given to a witness's testimony lies, in the first instance, with the trier of fact, and the credibility accorded by the trial judge will be given great weight by the appellate court. ***Id.*** Here, the evidence does not preponderate against the trial court's finding that the parties originally agreed to equally share the attorney's fee that might be produced by Client's case.

Next, Mr. Rosenberg claims that regardless of their original agreement, the language of the 1996 contract precludes Mr. Richter from recovering any portion of the attorney's fee in Client's case. The 1996 agreement addressed the payment of rent, utility bills, supply costs, and the secretary's salary, and it also set out an arrangement regarding three types of cases: (i) workers' compensation cases, (ii) files originating with either party subsequent to the contract, and (iii) "those

files currently handled by R. Linley Richter, Jr." Mr. Rosenberg does not contend that Client's case was one of the three types of cases addressed in the 1996 agreement. Rather, he relies on the provision of the agreement stating that it "replaces and supersedes any and all previous agreements" effective September 1, 1996. According to Mr. Rosenberg, because the 1996 agreement did not address Client's case, no agreement regarding Client's case could have existed after the 1996 contract was executed.

When resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language. *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889 -90 (Tenn. 2002) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). We determine the parties' intent "by examining the four corners of the contract and the circumstances at the time of contracting." *BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 135 (Tenn. 2001) (citing *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999); *Gredig v. Tenn. Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994)). "This determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.*, 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). Parol evidence is inadmissable to contradict or vary the terms of a written contract when the parties' intentions are readily ascertainable from the contract as reduced to writing. *Gates, Duncan & Vancamp Co. v. Levatino*, 962 S.W.2d 21, 25 (Tenn. Ct. App. 1997) (citing *McQuiddy Printing Co. v. Hirsig*, 23 Tenn.App. 434, 134 S.W.2d 197, 204 (1939)). However, the language of a contract "taken together with extrinsic facts" may lend itself to more than one reasonable inference of the intent of the parties. *See Blue Diamond Coal Co. v. Holland-America Ins. Co.*, 671 S.W.2d 829, 833-34 (Tenn. 1984) (finding the term "employer" ambiguous when considering the circumstances to which the word referred). Therefore, our initial task in construing a contract is to determine whether the language of the contract is ambiguous. *Planters Gin Co.*, 78 S.W.3d at 890. "Where a contractual provision is ambiguous, i.e., susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language." *Pylant v. Spivey*, 174 S.W.3d 143 (Tenn. Ct. App. 2003). If the contract is found to be ambiguous, we apply established rules of construction to determine the parties' intent. *Planters Gin Co.*, 78 S.W.3d at 890. "Only if ambiguity remains after the court applies the pertinent rules of construction does the legal meaning of the contract become a question of fact . . . ." *Id.* (citing *Smith v. Seaboard Coast Line R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981)). "[W]hen a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006).

Considering the language of the 1996 contract and the parties' circumstances at the time of its execution, we conclude the contract is susceptible to more than one reasonable interpretation regarding whether it was meant to replace, and effectively revoke, the parties' agreement about

-10-

Client's case. Based on the facts of this case, the phrase "[t]his agreement . . . replaces and supersedes any and all previous agreements" becomes ambiguous because no other agreement was created to address Client's case. The parties do not dispute that Client's case was not mentioned in the 1996 agreement, and that they did not consider Client's case as falling within the three categories of cases that were addressed. Clearly, Client's case was not a workers' compensation case, nor did it originate after the date of the contract. Client's case could arguably have been considered a file "currently handled by" Mr. Richter, and Mr. Richter purchased or "bought out" Mr. Rosenberg's 50% equity in those files. As such, Mr. Rosenberg would have had no interest remaining in the attorney's fee for Client's case. Of course, Mr. Rosenberg denies that Client's case fell within that category. Mr. Richter also testified that he did not consider Client's file to be one that he purchased from Mr. Rosenberg because they were both working together on Client's case at that time.[3] Accordingly, Mr. Richter contends that Client's case was not covered by the 1996 contract, and that the 1996 contract does not deprive him of half the attorney's fee in Client's case.

The trial court considered the parties' actions after the 1996 agreement as evidence that Client's case was "not included" and "not covered" by the agreement. Both parties continued to work together on the case after the agreement, just as they did before the agreement. Both parties testified they treated this case differently than other cases they worked on together. Also, the trial judge cited Mr. Raspberry's testimony that Mr. Rosenberg told him he "owed" Mr. Richter money on Client's case years after the 1996 contract was executed.

We conclude the evidence supports the trial court's finding that the parties did not intend the 1996 contract to encompass Client's case or alter their previous agreement to equally share the attorney's fee it produced. The 1996 agreement provides absolutely no guidance as to how the parties intended to handle Client's case. Admittedly, it does not provide that the parties would share the fee, but neither does it provide that Mr. Richter would receive nothing. The parties admit that Client's case does not fall within any of the three categories of cases that were addressed in the contract. Mr. Richter clearly did not intend that the 1996 contract would alter their agreement about Client's case. The parties continued to work together on the case, which suggests that some type of agreement existed. Mr. Richter testified he did not agree to work on the case for free. The trial judge accredited Mr. Raspberry's testimony that Mr. Rosenberg admitted he owed Mr. Richter money when the case settled.

In sum, we find no error in the trial court's conclusion that Mr. Richter was entitled to one-half the attorney's fee generated in Client's case, pursuant to the parties' oral agreement.

### B. Conversion

Mr. Richter contends that the trial court erred in finding that Mr. Rosenberg had not

_____

[3] At the time of the 1996 contract, the trial regarding compensatory damages in Client's case had already taken place, during which the parties acted as a "trial team." However, the matter was taken under advisement and the trial court had not yet issued its ruling.

committed conversion. Mr. Richter acknowledges that a finding of conversion would not change the amount of the judgment against Mr. Rosenberg, but he states that "a finding of conversion has implications under § 523(a)(6) of the United States Bankruptcy Code." That section provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b)
> of this title does not discharge an individual debtor from any debt–
> (6) for willful and malicious injury by the debtor to another entity or
> to the property of another entity; . . . .

11 U.S.C.A. § 523.[4]

In Tennessee, conversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights. *H & M Enterprises, Inc. v. Murray*, No. M1999-02073-COA-R3-CV, 2002 WL 598556, at *3 (Tenn. Ct. App. Apr. 17, 2002) (citing *Barger v. Webb*, 216 Tenn. 275, 278, 391 S.W.2d 664, 665 (1965); *Lance Prods., Inc. v. Commerce Union Bank*, 764 S.W.2d 207, 211 (Tenn. Ct. App. 1988)). "Conversion is an intentional tort, and a party seeking to make out a prima facie case of conversion must prove (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights." *Id.* (citing *Kinnard v. Shoney's, Inc.*, 100 F. Supp. 2d 781, 797 (M.D. Tenn. 2000); *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977)).

Here, the trial court found that the parties originally agreed to share the fee from Client's case equally, and the evidence supports that finding. The trial court further found that Mr. Richter had *not* proven that Mr. Rosenberg never intended to perform according to the agreement. The court then concluded that Mr. Richter had not proven his claim for conversion. As stated above, conversion is an intentional tort. To constitute conversion, the defendant must intend to convert the plaintiff's property. *General Elec. Credit Corp. of Tenn. v. Kelly & Dearing Aviation*, 765 S.W.2d 750, 753 (Tenn. Ct. App. 1988). "This intention does not necessarily have to be a matter of conscious wrongdoing, but can merely be an exercise of dominion or control over the property in such a way that would be inconsistent with the owner's rights and which results in injury to him." *Id.* It is the degree of interference with the property, as well as the duration of that interference, that will be determinative of whether there has been conversion. *Id.* at 753-54.

---

[4] Debts arising out of the following types of misconduct have been held to satisfy the willful and malicious injury standard: intentional infliction of emotional distress, malicious prosecution, conversion, assault, false arrest, intentional libel, and deliberately vandalizing a creditor's premises. *In re Best*, 109 Fed. App'x 1, 5, 2004 WL 1544066, at *4 (6th Cir. (Ky.) 2004). However, conversion may be "innocent and technical," and its judgment dischargeable, or it may be "willful and malicious," and not dischargeable. *Maryland Cas. Co. v. Fant*, 181 Tenn. 492, 496, 181 S.W.2d 753, 754-55 (Tenn. 1944) (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393, 397). The Sixth Circuit has held that a breach of contract cannot constitute the willful and malicious injury required to trigger § 523(a)(6). *In re Best*, 109 Fed. App'x at ; *see In re Bullock-Williams*, 220 B.R. 345, 347 (6th Cir. B.A.P. 1998) (holding debt for unpaid condo dues to be dischargeable: "[the creditor] must demonstrate that the Debtor intended to cause harm by failing to pay association dues. This encompasses more than just the 'knowing breach of contract' that was alleged.").

A person's intent is often inferred from circumstantial evidence, and thus, the witness's demeanor and credibility play an important role in determining intent. *In re Adoption of T.Z.T.*, No. M2007-00273-COA-R3-PT, 2007 WL 3444716, at \*5 (Tenn. Ct. App. Nov. 15, 2007) (citing *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005)). As explained above, we extend considerable deference to the trial court's factual findings, especially where issues of credibility and the weight of testimony are involved. *Bryant v. Baptist Health Sys. Home Care of East Tenn.*, 213 S.W.3d 743, 750 (Tenn. 2006). We decline to second-guess the trial court's assessment of Mr. Rosenberg's intention, and we affirm its finding that he did not commit the tort of conversion. We express no opinion as to whether this case involved a "willful and malicious injury" under the bankruptcy code.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court. Costs of this appeal are taxed to the appellant, Seymour S. Rosenberg, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.