IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 3, 2017 Session

**ALFRED H. KNIGHT, ET AL. v. TYREE B. HARRIS, IV**

**Appeal from the Chancery Court for Davidson County**
**No. 11-1045-III      Ellen H. Lyle, Chancellor**

————————————————————

**No. M2016-00909-COA-R3-CV**

————————————————————

This case arises out of the dissolution of a law firm and the resulting accounting. The trial court held that Appellant, who withdrew as a member of the Appellee/Firm, converted a portion of an earned fee by withdrawing the fee directly from the Firm's trust account. The trial court further held that the conversion was done through concealment so as to warrant an award of punitive damages. Appellant appeals the trial court's finding of conversion, the award of punitive damages, and its award of various accounts receivable and payables. We reverse the trial court's award of punitive damages against Appellant and reduce the compensatory damages award.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed in Part, Affirmed in Part, and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Katherine Anne Brown, Nashville, Tennessee, for the appellant, Tyree Bryson Harris, IV.

Robert L. Delaney and James Leroy Weatherly, Jr., Nashville, Tennessee, for the appellee, Willis & Knight, PLC.

**OPINION**

**I. Background**

Appellant Tyree B. Harris, IV is an attorney licensed in Tennessee. In 1999, Mr. Harris joined Appellee Willis & Knight (the "Firm") as a partner. At that time, the Firm operated as a partnership, and there were five partners: William R. Willis, Jr. (father of

Russell Willis), Alfred H. Knight, Alan Johnson, Reese Willis, Russell Willis (William R. Willis, Jr.'s son), and Marian Harrison. Russell Willis was made managing partner of the Firm in 1997. When Mr. Harris joined the Firm, he did not execute a partnership agreement, nor was he required to make a capital contribution. Rather; Mr. Harris met with William Willis, a senior partner, and based on the business Mr. Harris anticipated bringing to the Firm, an agreement was reached as to Mr. Harris' percentage of ownership. The percentage of ownership of each partner varied from year-to-year; however, each partner had an equal vote and expenses were shared equally, without regard to actual overhead per partner or percentage of ownership. Effective January 1, 2003, the Firm registered as a PLC with the State of Tennessee. Partners joined and left the Firm such that, by January 1, 2010, there were only three partners remaining: Russell Willis, Mary Arline Evans, and Mr. Harris. As the number of partners decreased, the Firm's revenue also decreased.

The building where the Firm's offices were located was owned by W&K Properties, which was owned by Alfred H. Knight and William R. Willis, Jr. In November 1978, the Firm entered into a triple net lease agreement with W&K Properties. By 2010, the lease was month-to-month with rental amounts varying monthly; at times, the monthly rent was as high as $10,000.00. However, the Firm was no longer occupying all of its leased space due to the decrease in employees and partners. Some adjustment to the Firm's overhead was needed. To that end, in early 2010, Russell Willis, as managing partner, met with his father, William Willis, to discuss a reduction in the rent. William Willis allegedly agreed to defer 25% of the total rent amount, but allegedly rejected the Firm's demand for a 50% reduction in the rent.

Due to his parents' declining health, Russell Willis could not continue to serve as managing partner of the Firm. In approximately June of 2010, Mr. Harris assumed the position of interim managing partner until Russell Willis resumed his practice full time in late August of 2010.

At issue in this appeal is the distribution of a fee of $336,857.57, which the Firm received from its client, Restaurant Supply Solutions, Inc. (the "RSSI Fee"). Restaurant Supply Solutions, Inc.'s check was dated February 24, 2010; however, there is some dispute as to when the Firm received the check. Regardless, Mr. Harris was the principal lawyer on the case and was assisted by associate Katherine A. Brown. A dispute arose between the Firm and the client as to a portion of the fees (i.e. approximately $70,000.00--$80,000.00 in fees paid for work done by accountants, who were called as experts in the case). Mr. Harris agreed to place the entire fee (not just the disputed portion) into the Firm's trust account pending resolution of the client's dispute. Angela Haynie Scherzer, the Firm's bookkeeper, testified that she deposited the check for the RSSI Fee into the Firm's trust account on or about May 28, 2010. At some point between May 28, 2010 and the end of the year, Mr. Harris, Russell Willis, and Mary Arline Evans met to discuss

allocation of the RSSI Fee. They allegedly agreed that the RSSI Fee would be allotted as follows: Mr. Harris would receive $225,000.00; Ms. Evans would receive $70,000.00, and Russell Willis would receive $41,857.57. This agreement was not reduced to writing. At the time the allocation decision was made, the Firm was allegedly current on all bills including rent.

Ms. Evans left the Firm effective September 14, 2010, which was before the client's accountant dispute was settled, but she allegedly expected to receive her portion of the RSSI Fee. Mr. Harris testified that the partners voted to distribute the RSSI Fee directly from the Firm's trust account to ensure that each partner would pay his or her pro rata share of the Firm's expenses. Ms. Evans testified that she did not recall whether the vote had included an agreement that the funds would be distributed from the trust account. Regardless, Mr. Harris caused three checks to be issued from the Firm's trust account, in the amounts outlined above. The checks, which were dated January 31, 2011, were written by Ms. Scherzer, the Firm's bookkeeper. Mr. Harris then signed his $225,000.00 check (number 1466) and Ms. Evans' $70,000.00 check (number 1472). Mr. Harris delivered Ms. Evans' check to her at her new office. As to Mr. Willis' $41,857.57 check, Mr. Harris testified that he caused the check to be issued but did not sign the check (because Mr. Willis, as a partner, could sign the check himself). It is undisputed that Mr. Willis never cashed his check, and the Firm ultimately transferred the remaining RSSI Fee (i.e., Mr. Willis' portion of the fee) into the Firm's operating account to pay expenses.

During the period Mr. Willis was not practicing full time, cash flow began to be a problem for the Firm. Allegedly, Russell Willis had not billed his clients during the period that he was helping with his parents, i.e., approximately 3 months. There is also a dispute, in this case, concerning the carry-over of approximately $70,000 in client expenses on William Willis' capital account. Mr. Harris asserts that these expenses should have been written off (before he joined the Firm), but were carried over in an effort to inflate William Willis' capital account.

Concerning the rent to W&K Properties, the Firm's cash flow during the first half of 2010 was sufficient to continue to pay the full amount of rent. Allegedly, Russell Willis represented to the other two partners that he was still negotiating a reduction of rent with William Willis. Expecting a reduction in rent, Mr. Harris contends that, after paying full rent through June 2010, the Firm decided to forego further payments because it expected that the amount paid to date for 2010 would cover the entire year if the rent had been reduced as expected. Ms. Scherzer testified that Mr. Harris was the person who told her to withhold rent after June 2010. Mr. Harris was the managing partner of the Firm at that time.

In July 2010, William Willis died, and Russell Willis became a part owner (19%) of the building where the Firm was located. Mr. Harris alleges that Russell Willis never

demanded rent and never disclosed that he had an ownership interest in the building after the death of William Willis. Regardless, in April 2011, representatives of W&K Properties made demand on the Firm for the full rent arrearage accruing from July 1, 2010.

Mr. Harris left the firm effective May 31, 2011. On July 29, 2011, Alfred H. Knight, W&K Properties, and Willis & Knight filed suit against Mr. Harris for fraud, conversion and outlandish conduct stemming from Mr. Harris' withdrawal of the $225,000.00 RSSI Fee from the Firm's trust account. The plaintiffs argued that these misappropriated funds should have been deposited into the Firm's operating account and used to pay Firm debts before being distributed to members of the Firm. The Firm sought $225,000.00 in compensatory damages, $100,000.00 in punitive damages, and an unspecified amount to pay Mr. Harris' "negative" capital account balance. The complaint further alleged that Mr. Harris engaged in a "fraudulent scheme" to hide income from the juvenile court in order to reduce his child support obligations. W&K Properties sought lost rent in the amount of $72,591.00 and attorney fees.

On October 6, 2011, Mr. Harris filed an answer, counter-complaint and third-party complaint, denying that he converted any funds from the Firm's trust account. Based on Russell Willis' alleged renegotiation of the rent amount, Mr. Harris further denied that W&K Properties was owed rent. Mr. Harris averred that he had been purposefully misled concerning the lease agreement between the Firm and W&K Properties. Mr. Harris further averred that he was misled concerning Russell Willis' ownership interest in the building, which interest, Mr. Harris alleged, affected Russell Willis' ability to be unbiased in the rent negotiations he made on behalf of the Firm. Mr. Harris also alleged that William Willis' capital account had been falsely inflated, and that Russell Willis breached his fiduciary duty by failing to maintain time records and failing to bill his clients, causing financial detriment to the Firm. Mr. Harris counter-complaint further alleged that Russell Willis appropriated all of Mr. Harris' accounts receivable after he left the Firm.

Alfred Knight died on October 10, 2011, and his estate was substituted as a party. On Mr. Harris' motion to dismiss W&K Properties' claims, the trial court entered an order on June 13, 2012, dismissing all allegations by W&K Properties as to alleged improprieties of fee allocation, testimony in juvenile court, and punitive damages. W&K Properties then withdrew its claim for attorney's fees. The trial court allowed the claim concerning Mr. Harris' personal responsibility for unpaid rent to stand.

The case was dormant for nearly two years. On September 12, 2014, Russell Willis filed an answer to the Third Party Complaint and asserted a counter-claim against Mr. Harris. On September 22, 2014, The Estate of Alfred H. Knight filed an answer to the Third Party Complaint. On September 26, 2014, Willis & Knight filed an amended complaint alleging fraud, intentional misrepresentation, concealment of material business

information, conversion, and breach of fiduciary duty. Six weeks before trial, Willis & Knight was granted leave to file a second amended complaint, by which it sought an award of a $10,000.00 judgment Mr. Harris received in circuit court for attorney fees he allegedly earned while still with the Firm.

The case was tried on July 13 through 16, 2015. On Mr. Harris' motion, the trial court dismissed W&K Properties' complaint against Mr. Harris. On July 22, 2015, the trial court entered findings of fact and conclusions of law, finding that Mr. Harris committed conversion, intentional misrepresentation, misrepresentation by concealment, fraud, and breach of fiduciary duty. The trial court dismissed Mr. Harris' counterclaim against Willis & Knight and awarded it a judgment of $31,000.00 for Mr. Harris' portion of the Firm's debts including rent and accounting fees. The trial court awarded the Firm the $10,000.00 attorney fee judgment Mr. Harris received in the circuit court case. The trial court also held that punitive damages against Mr. Harris were warranted.

On July 24, 2015, the Firm filed a motion to amend the ad damnum for punitive damages to increase the demand from $100,000.00 to $500,000.00. The trial court set a hearing and allowed time for discovery. The punitive damages portion of the trial was held on February 29 through March 1, 2016. On April 1, 2016, the trial court entered an order, awarding punitive damages in the amount of $90,000.00.

On April 28, 2016, Mr. Harris filed a notice of appeal and an appeal bond, which was secured by Mr. Harris' unencumbered residence. The residence is allegedly valued at $800,000.00. On May 20, 2016, the Firm filed a motion to reject or disapprove Mr. Harris' appeal bond because Mr. Harris owns the residence in joint tenancy with his wife. Subsequently, Mr. Harris filed a second bond, which was signed by his wife.

On April 29, 2016, the Firm filed a motion to alter or amend. On July 6, 2016, the trial court filed an amended order, increasing the compensatory award to $41,000.00 based on the trial court's "miscalculation" of the amount of rent owed. The trial court increased Mr. Harris' portion of the rent to $30,609.00, awarded accountants' fees of $7,262.00, and added an additional $17,101.50 to the judgment against Mr. Harris for monies owed by the Firm to the William Willis estate for the balance remaining in William Willis' capital account. In sum, the Firm was awarded $54,973.00 in compensatory damages. Initially, punitive damages were awarded in the amount of $90,000.00; however, in its order on Appellee's motion to alter or amend (*see infra*), the trial court imposed a "three times multiplier of compensatory damages" in setting the total amount of punitive damages at $164,919.00. In addition to the $10,000.00 previously awarded, the total judgment award was increased to $229,892.00. Then, after a hearing on August 12, 2016, the trial court awarded the Firm discretionary costs of $6,714.13. In view of the increased judgment, on July 13, 2016, the trial court entered an order granting the Firm's motion to reject Mr. Harris' appeal bond and requiring Mr. Harris to post a $225,000.00 cash bond. Mr. Harris appeals.

## II. Issues

Mr. Harris raises the following issues as stated in his brief:

1.       The trial court erred in finding the Appellant guilty of conversion, intentional misrepresentation and misrepresentation by concealment, fraud and breach of fiduciary duty, and awarding damages in the amount of $54,973 and the "Carter Fee"

       a.       The distribution of the RSSI fee to the members of the firm was made in good faith and in accordance with the express agreement of the members.

       b.       The trial court erred in awarding $30,609.00 in unpaid rent as compensatory damages.

       c.       The trial court erred in awarding $7,262.00 in accounting fees as compensatory damages.

       d.       The trial court improperly awarded 50% of the positive capital account of Mr. William R. Willis as an element of compensatory damages.

       e.       The trial court erred in allowing Appellee to amend its complaint after the running of the statute of limitation and in awarding Appellee the Carter Fee as additional damages.

2.       The trial court erred in failing to grant the Appellant's motion in limine re: spoliation requesting a negative inference against Appellee for destroying business records of Willis & Knight, PLC.

3.       The trial court erred in finding that the Appellant's conduct rose to the level of misconduct which would justify an award of punitive damages.

4.       If punitive damages are warranted, which the Appellant expressly denies, the award is excessive and should be reduced.

5.       The trial court erred and abused its discretion in voiding the property judgment bond filed by the Appellant.

       a.       Rule 62.05, Tennessee Rules of Civil Procedure, requires that a bond shall have "sufficient surety."

## III. Standard of Review

This case was tried without a jury. Accordingly, we review the trial court's findings of fact de novo, with a presumption of correctness unless the preponderance of the evidence is to the contrary. Tenn. R. App. P. 13(d). The trial court's conclusions of law, however, are reviewed de novo and "are accorded no presumption of correctness." ***Brunswick Acceptance Co., LLC v. MEJ, LLC***, 292 S.W.3d 638, 642 (Tenn.2008). Furthermore, "[w]hen credibility and weight to be given testimony are at issue, considerable deference must be afforded the trial court when the trial judge had the opportunity to observe the witness' demeanor and to hear in-court testimony." ***Mitchell v.***

*Fayetteville Pub. Utils.*, 368 S.W.3d 442, 447 (Tenn. 2012).

## IV. Conversion

Conversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights. ***Barger v. Webb***, 216 Tenn. 275, 278, 391 S.W.2d 664, 665 (1965); ***Lance Prods., Inc. v. Commerce Union Bank***, 764 S.W.2d 207, 211 (Tenn.Ct.App.1988). Conversion is an intentional tort, and a party seeking to make out a prima facie case of conversion must prove (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights. ***Kinnard v. Shoney's, Inc***., 100 F.Supp.2d 781, 797 (M.D. Tenn.2000); ***Mammoth Cave Prod. Credit Ass'n v. Oldham***, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977). "A wrongful intent on the part of the defendant is not an element of conversion and, therefore, need not be proved." ***PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp***., No. W2011-00325-COA-R3-CV, 2012 WL 1572130, at *22 (Tenn. Ct. App. May 4, 2012). Rather, a conversion claim focuses on "the interference with a property owner's right." ***Gen. Elec. Credit Corp. of Tenn. v. Kelly & Dearing Aviation***, 765 S.W.2d 750, 754 (Tenn. Ct. App. 1988).

In this case, it is undisputed that the Firm's usual operating procedure was for all fee collections to pass through the Firm's operating account, where the fees would be subject to the Firm's overhead expenses. After expenses, remaining funds were credited to each partner's capital account according to his or her percentage of ownership for that calendar year. At trial, former partners, William Herbert, IV and Alan Johnson testified that no funds were ever distributed directly to a partner from the Firm's trust account. Likewise, Mr. Willis testified that no funds had ever been paid directly to a partner from the trust account without passing through the operating account. The testimony of Messrs. Herbert, Johnson, and Willis was confirmed by the Firm's bookkeeper, Angie Scherzer, and its accountant, Sherry Connor, who, at all relevant times, was employed by Puryear, Hamilton, Hausman & Wood, PLC, as a Senior Tax Manager. Although, Mr. Harris does not dispute the Firm's practice of moving funds through the operating account, he avers that he, Ms. Evans, and Mr. Willis mutually agreed that the RSSI Fee would not pass through the operating account. Rather, he claims they agreed that their respective percentages of this fee would be paid directly from the trust account after resolution of the client's dispute. Although, at trial, Ms. Evans and Mr. Willis confirmed that they and Mr. Harris had agreed to the percentage of the RSSI Fee that each would receive, neither Mr. Willis nor Ms. Evans confirmed that the RSSI Fee would be distributed directly from the trust account. While Ms. Evans testified that she could not recall whether that was part of the agreement, Mr. Willis vehemently denied that the parties agreed to distribute the RSSI Fee from trust. In short, the question of whether the parties agreed to deviate from the Firm's usual course of business in distributing the RSSI Fee comes down to Mr. Willis' testimony versus Mr. Harris'. In its July 22, 2015

- 7 -

findings of fact and conclusions of law, the trial specifically found that Mr. Harris' testimony, on this point, was not credible, to-wit: "The Court does not accredit Defendant Harris' testimony that the payment of the $225,000 from the [Firm's] Trust Account to Defendant Harris . . . was discussed with or known to PLC Member . . . Russell Willis . . . prior to the [r]emoval of the funds. The Court finds Defendant Harris' [r]emoval of the funds was unilateral." As noted above, "[w]hen credibility and weight to be given testimony are at issue, considerable deference must be afforded the trial court when the trial judge had the opportunity to observe the witness' demeanor and to hear in-court testimony." *Mitchell v. Fayetteville Pub. Utils.*, 368 S.W.3d 442, 447 (Tenn. 2012). The trial court's finding that Mr. Harris' testimony, in regard to the distribution of the RSSI Fee from the trust account, was not credible, coupled with the undisputed fact that, prior to the distribution of the RSSI Fee, the Firm had never deviated from its usual course of business preponderates in favor of the trial court's finding that Mr. Harris converted at least some portion of the RSSI Fee. Accordingly, we affirm the finding of conversion.

## V. Compensatory Damages

### A. Rent

In its July 6, 2015 amended order, the trial court calculated Mr. Harris' share of the Firm's unpaid rent as follows:

> The Court . . . finds that [Mr. Harris'] share of the rent . . . is $30,609.50. The Court derives that number from trial exhibit 16 with the detail that from July to September of 2010 the Court finds [Mr. Harris'] share of the rent was $6,034.[1] As of October 2010 through April 2011, the Court finds that [Mr. Harris'] share of the rent was $21,432. As of May 2011, the Court finds that [Mr. Harris'] share of rent was $3,143. Those rents total $30,609.

Throughout these proceedings, Mr. Harris has maintained that he should not be charged with any rental amounts after June of 2010. Specifically, Mr. Harris argues that he was intentionally misled by Russell Willis, who was allegedly "still representing that he would get his father to agree to a 50 percent reduction in rent." At the hearing, Russell Willis testified that, in January or February of 2010, he approached his father, William Willis and told him that the Firm "needed to have some relief from the rent." Russell Willis testified that he suggested a 50% reduction in rent, and his father "said he would go and talk with [Alfred Knight, the other owner of W&K Properties]." Russell Willis

---

[1] Trial Exhibit 16, on which the trial court relied, is titled "Willis & Knight Capital allocation." According to the testimony of the Firm's accountant, Sherry Conner, she prepared this document, at the request of Russell Willis, for the purpose of "calculat[ing] the capital balances of the partnership [through] April 30, 2011." We will discuss this exhibit further below.

explained that his father "got back to me and told me that the offer was a 25-percent deferral of the rent." Russell Willis contends that he informed his father that "that simply wasn't enough, on a cash flow basis, for [the Firm] to survive . . . but I'd take [the offer of a 25% deferral] to the other members of the law firm and I'd get back one way or another to him." Russell Willis went on to testify, in pertinent part, as follows:

> Q. After you had the conversation with Mr. Willis after he got back to you . . . and he said, we can defer 25 percent for a period of time, what did you do next?
>
> A. I came down and reported to Mr. Harris and Ms. Evans that that was the offer, that I didn't recommend us taking it. I didn't think it was sufficient for us and the needs we had, and that we either needed to get more people in the firm and reconstitute and fill back up, or we needed to look at other space. And while, in the past, I had been reluctant to move, I told Mr. Harris at that point that I have no problem if we decide we need to move. . . .
>
> Q. And what did Mr. Harris say to you in return?
>
> A. Mr. Harris was nonplused with that at all. I didn't really get much response back. I asked for a motion to be made about leaving or taking this deal or not, and I got nothing back. . . .
>
> Q. And what, if any, discussions did you and Mr. Harris have? In other words, what did he say to you or you say to him about pending negotiations with W & K Properties to reduce the rent?
>
> A. There were no promises of any continued negotiations. My father made it clear, after talking to Al Knight, that that was the offer, and that they felt they could do better if we moved out than to cut it down to 50 percent for some unknown period of time.

In his testimony, Mr. Harris stated that, after Russell Willis informed the other partners that his father had not agreed to reduce the Firm's rent, he told the other partners that he would go back to his father and continue negotiations. In its July 22, 2015 order, the trial court specifically found that Mr. Harris' testimony "at trial that he was misled to believe by PLC Member Russell Willis that he was in negotiations for rent abatement from spring of 2010 forward," was not credible. However, even if we allow, *arguendo*, that Mr. Harris had a basis to believe that Russell Willis continued his negotiations with W&K Properties, there is no indication that any agreement was ever reached. In his appellate brief, Mr. Harris states that, after the meeting when Mr. Willis informed the partners of the results of his initial rent negotiations, "[t]here were no further discussion of any kind about rent until . . . April 11, 2011, when Ms. Evans and [Mr. Harris] were

confronted with a demand to pay rent." Again, there is no evidence to support a finding that Mr. Harris should have believed that the Firm's rent had been reduced, deferred, or otherwise abated. Even if Mr. Harris was under the impression that Russell Willis was taking care of the issue, as a Firm partner, with financial interest in the Firm's overhead expenses, Mr. Willis should have confirmed that the rent dispute had, in fact, been resolved favorably before instructing Ms. Scherzer to withhold rent payments after June of 2010. Because the evidence does not preponderate against the trial court's findings, we affirm the award of $30,609 as Mr. Harris' share of the Firm's rent arrears.

## B. CPA Fees

As part of the award of compensatory damages, the trial court awarded the Firm $7,262.00 as Mr. Harris' portion of the Firm's CPA fees. In the trial court's July 6, 2016 order amending its previous damage award, the court states, in relevant part:

> After reviewing the motion to alter or amend, the court concludes it did not err in the method it used to measure damages but miscalculated the amount of rent and left out one item of damage.
> Specifically, the part of the court's July 22, 2015 Memorandum and Order which it alters and amends is the following contained on the first paragraph of page 5:
>
>> The damages attributable to Defendant Harris' misconduct are $31,000.00. Accrediting the testimony of CPA Conner and assisted by trial exhibit 16, the $31,000.00, the court finds, is the approximate amount of Defendant Harris' member portion of the PLC debts consisting of rent owed and a fee to the CPAs.
>
> The foregoing is vacated and replaced by the following findings of fact and conclusions of law.
> The court finds that as of the date the Defendant left the firm in May 2011, his share of the CPA expenses was $7,762. . . . That is part of the altered and amended amount of compensatory damages the Court awards.

On June 2 2016, prior to ruling on Appellee's motion to alter or amend, the trial court allowed the Firm to file Sherry Connor's Affidavit, which purports to clarify some portions of her trial testimony in response to Mr. Harris' response to the Firm's motion to alter or amend. Concerning the fees owed, by the Firm, to Ms. Connor's employer, Puryear, Hamilton, Hausman & Wood, PLC, the affidavit states:

> The $22,695 on Exhibit 16 listed as owed to Puryear, Hamilton, Hausman & Wood, PLC was the amount owe by the law firm as of May 15, 2011 for

work done by me and my firm for Willis & Knight, PLC through the date of the creation of Exhibit 16. . . . In computing Mr. Harris' capital account balance as reflected on Exhibit 16 a percentage of the debt owed to Puryear, Hamilton, Hausman & Wood, PLC was attributed to Mr. Harris in an amount less than his membership interest in Willis & Knight, PLC as of May 15, 2011 but in an amount keeping with his membership interest as of September, 2010 . . . .

On appeal, Mr. Harris contends that the award of $7,262.00 should be reversed. Specifically, Mr. Harris argues that the trial court erred in allowing the post-trial filing of Ms. Connor's affidavit and relying on same in amending its previous compensatory damage award. As set out in context above, in ruling on the motion to alter or amend the trial court does not specifically indicate that it relied on Ms. Connor's affidavit in its amended award including Mr. Harris' share of the Firm's CPA expenses. However, even if we allow, *arguendo*, that the trial court erred in allowing the post-trial affidavit to be admitted to the record, Exhibit 16, which was admitted into evidence at the trial, clearly contains a line-item showing $7,762 as Mr. Harris share of the "Puryear, Hamilton, Hausman & Wood payable." It is well settled that "[t]he admission of improper evidence of a fact in issue is harmless where the verdict or judgment is supported by sufficient competent evidence," *Berke v. Chattanooga Bar Ass'n*, 436 S.W.2d 296, 304 (Tenn. Ct. App. 1968 (internal citations omitted). Here, Mr. Harris argues that Exhibit 16 provided insufficient proof of the Firm's payable as the exhibit was not supported by any evidence, such as invoices or cancelled checks, to show that these chargers were, in fact, accrued and paid by the Firm. In reviewing the portion of Ms. Connor's testimony where Exhibit 16 was admitted, Mr. Harris failed to lodge a specific and timely objection to the exhibit. "Generally, failure to make a timely, specific objection in a trial court prevents a litigant from challenging the introduction of inadmissible evidence for the first time on appeal." *Welch v. Bd. of Prof'l Responsibility for the Supreme Court of Tenn.*, 193 S.W.3d 457, 464 (Tenn. 2006) (citing *M. Lewis & Sons v. Illinois Cent. R. Co.*, 259 S.W. 903, 904 (Tenn. 1924); *Grandstaff v. Hawks*, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000); *Wright v. United Servs. Auto. Ass'n*, 789 S.W.2d 911, 914 (Tenn. Ct. App. 1990)). Error predicated on a ruling admitting evidence must affect a substantial right of the party and "[i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context." Tenn. R. Evid. 103(a)(1). Having failed to object to the admission of Exhibit 16 in the trial court, Mr. Harris cannot be heard to complain about its validity on appeal. Independent of Ms. Connor's late-filed affidavit, Exhibit 16 provides independent evidence to support the trial court's award of $7,262.00 as Mr. Harris' portion of the Firm's CPA fees. Accordingly, we affirm this portion of the trial court's award.

## C. Capital Account

In its July 22, 2015 findings of fact, the trial court stated, in relevant part, that: The Court does not award the Plaintiff PLC damages for what the parties referred to as an "accounts receivable/cost advanced" write off of some $64,000 to $70,000 with Defendant Harris' portion being about $32,000. The Court finds that the Plaintiff failed to carry its burden of proof that firm policy or custom, or law allocates part of this write-off to Defendant Harris. In so findings, the Court relies upon evidence that the CPA in her three-year look back and research, and research by attorneys to try to locate the source of the $70,000 costs advance were unsuccessful indicates that the costs advanced was not of recent origin. More fundamentally the evidence established that it was the policy of the PLC for at least the last 10 years for members of the PLC to annually write-off uncollected advanced costs. Additionally, the greater weight and preponderance of the evidence is that the $70,000 unaccounted for advanced costs was a past bookkeeping or other error. All of this substantially detracts from the Plaintiff's allocation to Defendant Harris some portion of the write-off of the $70,000 costs advanced.

Although the trial court initially held that Mr. Harris could not be held responsible for any portion of the $70,000 "costs advance[]," in ruling on the Firm's motion to alter or amend, the Court amended its initial holding as follows:

The other alteration and amendment is that the Court did not take into account in its July 22, 2015 findings the positive account of William Willis in the amount of $34,203, shown on exhibit 16, in assessing the Firm's debts at the time of the Defendant's departure from the Firm. The reason the Court did not take that into account was because of the uncertainty and ambiguity in the $70,000 cash advance and its allocation, discussed in the Court's findings of July 22, 2015. The Court, now, sees, however, that since it did not conclude it was appropriate to deduct any of the $70,000 cash advance to the Defendant's capital account, the Court should also not use that as a reason to eliminate or not include the $34,203 owed to the estate of William R. Willis in its assessment of compensatory damages. Bolstering this conclusion is the testimony of the CPA, Ms. Connor, that she had no information and nothing to suggest that the 18-year unallocated cost advance was attributable to work or billings of William Willis. Accordingly, the $34,203 was a debt the Firm owed when the Defendant diverted the funds in issue. The Defendant's share of that $34,203 would be 50% or $17,201.50 and is an item of compensatory damages.

- 12 -

It is undisputed that, from the time Mr. Harris joined the Firm in 1999 until January 1, 2003, the Firm operated as a partnership. Under the Tennessee Revised Uniform Partnership Act, at Tennessee Code Annotated Section 61-1-306(b),

> [a] person admitted as a partner into an existing partnership is not personally liable for any partnership obligation incurred before the person's admission as partner.

Accordingly, in the first instance, in order to recover any portion of the $70,000 fee from Mr. Harris, the Firm would have the burden to show that the $70,000 fee was accrued after Mr. Harris joined in 1999. Although the $70,000 discrepancy was discovered in approximately 2008, the discovery of the expense is not proof of when it accrued.

The evidence indicates that the Firm's usual operating procedure on outstanding client advance fees was for the outstanding fees to be presented to the attorney for that client. The attorney would review the expense and determine whether it could be collected. If so, he or she would attempt collection; if not, the expense would be "written-off" at the end of the year. Concerning why the $70,000 was not written-off, Ms. Connor testified, in pertinent part, that:

> Q. But you [Ms. Connor] determined that [the] $70,000 . . .was . . . a phantom asset; correct?
>
> A. Correct.
>
> Q. All right. Why was it a phantom asset? Why could it not be collected?
>
> A. It could have been collected but recorded incorrectly. . . .
>
> ***
>
> Q. Okay. And then what did you do to determine that 70,000 . . . was not collectible.
>
> A. Because . . . it was a phantom number . . .
>
> Q. Could not relate it to a particular cost advance?
>
> A. Correct.
>
> Q. Could not relate it to a client?
>
> A. Correct.

Q. Could not determine whether it had been paid or not in the past?

A. Correct.

***

Q. And as we are here today in court, you cannot state that you possess any information that any portion of the uncollectible accounts receivable were incurred while I [Mr. Harris] was a partner or an equity member . . . can you.

A. I cannot assign. . . the $70,000 unassigned accounts to any partner.

Q. That's not exactly my question, Ms. Connor, and I want to make certain that you understand, is . . . none of the accounts receivable that were determined to be uncollectible, not a single one, can you provide the court with any substantiation that any of those expenses were incurred while I was either a partner or an equity member of Willis & Knight . . . can you?

A. No.

Russell Willis testified that he discovered the accounting discrepancy of approximately $70,000 as he was reviewing the books in preparation for Ms. Evans' departure from the Firm. Like Ms. Connor, neither Mr. Willis, nor any of the Firm's employees were able to trace this "phantom" $70,000 to its source, to-wit:

Q. All right. And did this uncollected advanced cost issue come up in the context of [Ms. Evans'] withdrawal and the winding up of affairs with her.

A. Yes, sir. Yeah, I didn't know about it. What I knew . . . was that –there was something about the financials that just didn't look right when I was looking at them in that September time frame, trying to get the capital account numbers for Ms. Evans. And I . . . ask[ed] the CPA firm to dig in a little bit and make sure that I could understand what these numbers meant. . . . . And shortly after beginning that deal, that digging that they did, Ms. Connor called me and said, "We've got this issue, what can you tell me about it?" And I said, uncollected costs, cost advances, that's something we deal with . . .[a]nd usually once . . . a year or once every two years the lawyers will sit down and go through their receivables and tell us who's paying and who's not, and who can we write off.

***

- 14 -

I sat down and talked with Angie [Scherzer], and told her to dig into that and see what information we could provide to the . . . CPA firm . . . . Ultimately, we decided that we had no information about these particular costs [i.e., the $70,000] . . . [and] [the Firm's employees] identify certain costs to certain clients. And because of that, we're supposed to write that off.

And when she told me that, I thought, Okay, that's fine, we'll just write it off. I didn't really appreciate the fact that that impacted the capital accounts. . . .

Q. All right. And once you learned of that issue, what discussions, if any, did you have with Ms. Evans and Mr. Harris about that issue?

A. Well, I told them about that as soon as I found out about it. . . . And looking at this stuff, I'm sorry to report that we've got about $70,000 that's been reported to me that is a phantom asset, and it's going to have to be written off. And I can't trace it back, I don't know where—how it occurred, when it occurred. And we're going to have to write it off, and in doing so, it's going to increase our [i.e., Russell Willis and William Willis'] capital accounts.

This Court has previously explained that the party seeking damages has the burden of proving them. In tort cases, the proof of damages need not be exact or mathematically precise. Rather, the proof must be as certain as the nature of the case permits and must enable the trier of fact to make a fair and reasonable assessment of the damages. The amount of damages is not controlled by fixed rules of law, or mathematical formulas. It is instead left to the sound discretion of the trier of fact. Damages may never be based on mere conjecture or speculation. However, uncertain or speculative damages are prohibited only when the existence, not the amount, of damages is uncertain. Evidence required to support a claim for damages need only prove the amount of damages with reasonable certainty. *Overstreet v. Shoney's, Inc*., 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999). We have also observed that: "While it is true that speculative damages cannot be recovered, in the sense that the fact of damage is uncertain, contingent or speculative, 'mere uncertainty as to the amount will not prevent recovery if the evidence is of such certainty as the nature of the case permits and such as to lay a foundation enabling the trier of fact to make a fair and reasonable assessment of damages.'" *Pinson & Associates Ins. Agency, Inc. v. Kreal*, 800 S.W.2d 486, 488 (Tenn. Ct. App. 1990) (quoting *Wilson v. Farmer's Chem. Ass'n*, 444 S.W.2d 185, 189 (Tenn. Ct. App. 1985). In other words, speculation as to the existence of damages negates an award of damages, but if a party establishes that he or she has, in fact, incurred damages, then the trier of fact has discretion to determine the reasonable amount of those damages. Here, the Firm has failed to meet its initial burden to show that the $70,000.00 discrepancy is a valid

expense subject to inclusion in the award of compensatory damages. Not only can the Firm not trace the genesis of this expense, but there is also testimony that the expense may have, in fact, been written off at some point but not noted in the Firm's financial records. Regardless, both Mr. Willis and Ms. Scherzer refer to this $70,000.00 as a "phantom expense," which can only mean that it is completely speculative. Such speculative damages should be denied. Accordingly, we reverse the trial court's award of $17,101.50 against Mr. Harris.

### D. "Carter Fee"

Mr. Harris contends that the trial court erred in awarding the Firm the $10,000.00 attorney fee award in the Martha Carter case. The Firm, and specifically Ms. Evans, initially represented Ms. Carter in her divorce case, which concluded 2006. As is relevant to this appeal, beginning in approximately June of 2009, Mr. Harris began representing Ms. Carter in a post-divorce child support matter in the Circuit Court for Davidson County. Trial Exhibit 22 is a "Willis & Knight Review Statement," outlining the fees accrued in Ms. Carter's post-divorce matter from June 16, 2009 through May 31, 2011, the effective date of Mr. Harris' withdraw from the Firm. The statement includes billing for work done by four Firm employees. The total bill was for $37,965, of which Mr. Harris' billings comprised $32,642.50 (at $275.00 per hour).

Ms. Carter's post-divorce matter was tried, by Mr. Harris, in June of 2011, after he withdrew from the Firm. Ms. Carter was ultimately successful in her lawsuit, and Mr. Harris sought recoupment of attorney fees and costs from Ms. Carter's ex-husband. To that end, Mr. Harris testified that he asked for approximately $36,000.00 in fees. According to his appellate brief, "[t]he invoice supported the request for fees was drastically redacted at the request of the . . . Circuit Court, and ended up being for slightly in excess of $26,000.00." The "invoice," to which Mr. Harris refers, is not included in our record. Regardless, on or about January 6, 2012, some seven months after Mr. Harris withdrew from the Firm, the Circuit Court awarded $10,000.00 in fees.

In the first instance, Mr. Harris argues that "there was a clear understanding that Ms. Carter would not be billed for any work that he did, in the same way he would never bill a family member." Mr. Harris' argument is based on the fact that, following Ms. Carter's divorce, she and Mr. Harris became romantically involved and ultimately married. Indeed, Exhibit 22 reflects an "H" after each line-item of Ms. Carter's bill. As explained at trial, the "H" stands for "Held," meaning that, at the request of the lead attorney (here, Mr. Harris), the Firm would hold its billings. The mere fact that a billing may be "held" is not, *ipso facto*, proof that the bill is not a receivable of the Firm. Even if we allow, *arguendo*, that there was some understanding that Ms. Carter's fees would not be collected by the Firm, the fact is that $10,000.00 of the fee was ultimately awarded by the Circuit Court. The question, then, is whether this $10,000.00 is the property of the Firm.

It is undisputed that the Firm operated on, what Mr. Willis described as a "come in naked and leave naked" agreement. As he explained, this procedure allowed an equity member to join the Firm without having to make a capital contribution; however, when that partner withdrew from the Firm, he or she left his or her accounts receivable with the Firm. Although Mr. Harris contends that the majority of the Carter bill accrued after the trial due to "a significant number of post-trial motions," Mr. Harris has provided no proof as to what portion, if any, of the requested fees was for work he completed after withdrawing from the Firm. What we are left with is Exhibit 22, which clearly indicates that, as of the day of his withdrawal from the Firm, some $30,000.00 of Ms. Carter's bill was an account receivable of the Firm.

As a procedural argument, Mr. Harris contends that the trial court erred in allowing the Firm to amend its damage request to include the $10,000.00 Carter Fee. Specifically, because the fee was not awarded until well after Mr. Harris left the Firm, and the Firm did not seek to recover the fee by intervention in the Circuit Court, Mr. Harris argues that it should be precluded from claiming any right to the fee. We disagree. The gravamen is not when the fee was ultimately collected but, rather, when the fee accrued as an account receivable of the Firm. Exhibit 22 clearly indicates that some $30,000.00 in fees accrued on Ms. Carter's account before Mr. Harris left the Firm. In view of the Firm's uncontested practice of retaining a departing member's accounts receivable, the Firm had a right to seek the $10,000.00 that was ultimately awarded in Ms. Carter's case. As such, we cannot conclude that the trial court erred in awarding this fee to the Firm in partial payment of the accounts receivable pending at the time of Mr. Harris' departure.

### VI. Punitive Damages

In reviewing the award of punitive damages in this case, we are mindful of the standard for such an award. The trial court may award punitive damages if it finds, by clear and convincing evidence, that a defendant's wrongful actions were intentional, fraudulent, malicious, or reckless. *Hodges v. S.C. Toof & Co*., 833 S.W.2d 896, 901 (Tenn. 1992). To establish his claim for punitive damages for Mr. Harris' conversion, the Firm was required to show, by clear and convincing evidence, that the conversion "'was accompanied by malice, insult, reckless and willful disregard of the [Firm's] rights, or other proof showing the aggravated nature of the act.'" *White v. Empire Exp., Inc*. 395 S.W.3d 696, 720-21 (Tenn. Ct. App. 2012) (quoting. E. LeFevre, *Punitive or Exemplary Damages for Conversion of Personalty by One Other Than Chattel Mortgagee or Conditional Seller*, 54 A.L.R.2d 1361 § 2 (1957 & Cum. Supp.) (cases cited therein)); *see also* 18 Am.Jur.2d Conversion § 125 (2004) ("Generally speaking, punitive damages may be allowed in a conversion action when the conversion involves elements of fraud, ill will, malice, recklessness, wantonness, oppression, insult, willful or conscious disregard of the plaintiff's rights, or other aggravating circumstances." (Footnotes omitted)). Clear and convincing evidence leaves "no serious or substantial doubt about the correctness of

the conclusions drawn from the evidence." ***Hodges***, 833 S.W.2d at 901 n. 3. "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable' than not." ***In re M.A.R.***, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting ***In re C.W.W.***, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)); *see* ***Teter v. Republic Parking Sys., Inc.***, 181 S.W.3d 330, 341 (Tenn. 2005) (noting that the clear and convincing standard "is used to promote important public policy and preserve prior judicial orders" and "in circumstances involving extraordinary remedies"). The question of whether the record contains clear and convincing evidence to support the trial court's decision is a question of law, which this Court reviews pursuant to the following standard:

> Under [the clear and convincing] standard of proof, the appellate court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." The facts as found by the trial court are reviewed de novo on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Findings of fact based on witness credibility are given great deference and will not be disturbed absent clear evidence to the contrary. Whether the combined weight of the facts, either as found by the trial court or supported by a preponderance of the evidence, establish clearly and convincingly that [punitive damages are warranted] is a question of law, subject to de novo review with no presumption of correctness.

***In re Samaria S.***, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011) (involving allegations of severe child abuse, which must be proven by clear and convincing evidence) (citations omitted).

In finding that Mr. Harris' actions, in withdrawing the RSSI Fee from the Firm's trust account, were sufficiently egregious to warrant an award of punitive damages, the court, in its July 22, 2015 findings, specifically stated that:

> The Court finds that the evidence is clear and convincing that Defendant Harris' misconduct was intentional concealment, deceptive and in bad faith. . . . The Court finds that the proof established that Defendant Harris was motivated by resentment that for years he had paid a disproportionate share of overhead and firm expenses. Defendant Harris had been unable to effect through member meetings a change in the PLC's policy about a member's payment of overhead. Also, Defendant Harris did not believe Russell Willis should share in the fee Defendant Harris removed from the PLC Trust Account. All of these motivations bear upon the Court's finding of clear and convincing evidence of bad faith, intentional concealment and deception . . .

- 18 -

From our review, the foregoing findings are not supported by clear and convincing evidence in the record. In the first instance, it is undisputed that Mr. Harris did not draw the disputed checks for payment of the RSSI fee himself. Rather, he asked Ms. Scherzer, the Firm's bookkeeper, to issue the checks. Thus, had Mr. Harris intended to conceal the distribution of the RSSI Fee, it would be logical that he would have drawn the checks himself and not gone through Ms. Scherzer. Furthermore, Mr. Harris had three checks issued—one to himself, one to Ms. Evans, and one to Mr. Willis. Although it is disputed whether Mr. Willis received his check, Ms. Scherzer does not deny that she issued it. Regardless, had Mr. Harris' intent been to conceal his actions, it would make sense that he would have withdrawn only his portion of the RSSI Fee. Furthermore, there is no evidence that Mr. Harris requested that either Ms. Scherzer or Ms. Evan refrain from informing Mr. Willis that the checks had been issued, nor is there any evidence that Mr. Harris intercepted the Firm's bank statements, in which his check and Ms. Evans' were negotiated. In fact, Mr. Willis testified that he opened the bank statements and learned of the checks then. While we concede that Mr. Harris converted some portion of the RSSI Fee, *see* discussion *supra*, the evidence is insufficient to clearly and convincingly establish that he did it with ill intent. As such, we reverse the trial court's award of punitive damages.

In view of the adjudication of this appeal, Mr. Harris' issue concerning the appellate bond is rendered moot, and we pretermit all remaining issues.

## VII. Conclusion

For the foregoing reasons, we reverse the trial court award of $17,101.50 as Mr. Harris' portion of the "phantom" cash advance, and its award of $164,919.00 in punitive damages. The order of the trial court is otherwise affirmed. We remand the case for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed one-half to the Appellant, Tyree B. Harris, IV and his surety, and one-half to the Appellee, Willis & Knight, PLC, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE