**MAMMOTH CAVE PRODUCTION CREDIT ASSOCIATION,**
Plaintiff-Appellee,

v.

**L. H. OLDHAM and Walter Taylor d/b/a Smith County Tobacco Warehouse Co.,**
Defendants-Appellants.

Court of Appeals of Tennessee,
Middle Section.

Aug. 26, 1977.

Certiorari Denied by Supreme Court
Oct. 17, 1977.

Solon Fitzpatrick, Carthage, for defendants-appellants.

Charles H. Beaty, Beaty & Phillips, Gallatin, for plaintiff-appellee.

## OPINION

DROWOTA, Judge.

This case raises several questions about the validity of and prerequisites to a suit for conversion by the holder of a security interest in crops under Article 9 of the Uniform Commercial Code against a factor and commission merchant, which sold the collateral for the debtor and turned over the proceeds to him.

Plaintiff, Mammoth Cave Production Credit Association, a corporation in the business of agricultural financing in Kentucky, filed suit in Smith County Chancery Court on July 30, 1975, against L. H. Oldham and Walter Taylor, partners in a tobacco warehouse business known as Smith County Tobacco Warehouse Co. The complaint alleged that, because defendants had sold through their warehouse certain tobacco in which plaintiff claimed a security interest and had paid the proceeds to plaintiff's debtor, defendants were liable to plaintiff for conversion in the amount of $2,289.00, the value of the debtor's tobacco. A very brief hearing was held before the Chancellor, who on September 16, 1976, filed a memorandum opinion in which he found defendants liable to plaintiff for $2,289.00. This conclusion was implemented by a decree to the same effect on October 1, 1976. Defendants have appealed from this decree, disclaiming liability and challenging the validity of plaintiff's security interest, *inter alia.*

The proof in the case is brief, consisting of a page and a half of stipulations, seven pages of testimony from defendant Oldham, and documentary exhibits. From these, it appears that the debtors, Glen Carter and wife, executed a promissory note for $22,000.00 to plaintiff on March 8, 1973. On March 26, 1974, the same parties executed a document entitled "Financing Statement and Security Agreement," which was introduced into evidence. This agreement contains the names, addresses, and signatures of the parties, and purports to give plaintiff a security interest in certain crops, farm equipment, and livestock of the Carters. The description of the crops covered by the agreement reads in part as follows:

All tobacco crops, Including but not limited to all of 2800 pounds on Gene B. Sewell farm, all of 1826 pounds on Curtis Anderson, all of 830 pounds on Robert Shaw, ½ of 5200 pounds on Dewey Allen

.  .  .  .  .

The agreement also sets out several covenants and provides that upon breach of any one of them, all indebtedness secured by the agreement will become due and payable "at the option of the Lender." One of these covenants provides that the debtor "will not further encumber, conceal, remove, sell or otherwise dispose of [the collateral] without the written consent of the Lender .  . .." In spite of this provision restricting sale, the agreement also contains a further item in which a security interest is claimed in the proceeds of the collateral previously described in it. It was stipulated that a copy of this document was filed for record in the office of the County Court Clerk in Cumberland County, Kentucky, the county in which the tobacco in dispute here was grown, and that it was not filed in Tennessee, where defendants' warehouse is located.

The tobacco in question here was grown by the debtor, Carter, on the farm of Dewey B. Allen. It is stipulated that Allen, who evidently had half the farm's tobacco for himself while Carter had the other half, put the tobacco on the floor of defendants' warehouse to be sold on January 2, 1975. The tobacco was sold on January 6 at which time, on Allen's order, defendants paid $2,288.29 to Carter and $2,289.00 to Allen by two separate checks.

Also part of the record is a certified letter from plaintiff, addressed to Smith

County Tobacco Warehouse and dated November 5, 1974. This letter specified the "crops rented" by Carter in essentially the same manner as the security agreement, and its list included "½ of 5200 pds. on Dewey Allen, Rt. 1, Burkesville, Ky." Although plaintiff alleges in its complaint that this letter was accompanied by a copy of the security agreement, this is not established by the proof. The letter does, however, give the agreement's file number in the Cumberland County Court Clerk's office and state the principal owed plaintiff by Carter as $16,511.93. It is stipulated that defendants received this letter on November 19, 1974.

The brief testimony of defendant Oldham established that defendants' warehouse had made the sale as factor and commission merchant, that is, the warehouse did not buy any tobacco from Carter or Allen but merely sold it for them. Oldham admitted receiving the letter from plaintiff, but maintained that he had had no actual knowledge of the security interest. He said it was customary to receive notice of such interests by letter and to keep a list of debtors' names to check the sales against, but pointed out that Carter's name appeared nowhere in the bill for this tobacco or in defendants' other records.

Relying upon the foregoing, the Chancellor found defendants liable to plaintiff for conversion in the amount of $2,289.00. In his memorandum opinion, while he noted that the description of collateral in the security agreement was "very meager" and that "it is possible that under the terms of the Commercial Code of the State of Kentucky, that it could be invalid," he did not decide the issue of the security interest's validity. Instead, the Chancellor focused on the issue of actual notice and found that defendants had such notice of the security agreement. He evidently believed that this finding made it unnecessary to consider either the validity or the perfection of the security interest under the Uniform Commercial Code, on the theory that the only purpose of doing so would be to establish defendants' constructive notice via the filing provisions of the Code and that this was unnecessary in view of their having had actual notice. The Chancellor, then, found that defendants had actual notice of plaintiff's security interest and held them liable for conversion.

■ "A conversion, in the sense of the law of trover, is the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of plaintiff's right." *Barger v. Webb,* 216 Tenn. 275, 391 S.W.2d 664, 665 (1965); see W. Prosser, Law of Torts 79–97 (4th ed. 1971). To be liable, the defendant need only have an intent to exercise dominion and control over the property that is in fact inconsistent with the plaintiff's rights, and do so; good faith is generally immaterial. Prosser, *supra,* at 83. There is some relaxation of this rule, however, in cases absolving of liability for conversion agents who themselves acted in good faith, without actual notice of the interference with the plaintiff's rights. See *J. T. Fargason Co. v. Ball,* 128 Tenn. 137, 159 S.W. 221 (1913); *Frizzell v. Rundle,* 88 Tenn. 396, 12 S.W. 918 (1890); Prosser, *supra,* at 85–86, 88–89. We note, however, that this more lenient principle could not apply in the case at bar because defendants did have actual notice of plaintiff's security interest.

Under the Code, it is clear that a secured party cannot sue for conversion of collateral as a result of its disposition by the debtor unless that disposition is unauthorized, for a disposition authorized by the secured party results in the loss of the security interest in the collateral and retention of a security interest only in identifiable proceeds. T.C.A. § 47–9–306(2). Beyond this, it is unclear exactly what rights, if any, the secured party must show in the collateral to state a cause of action for conversion.

■ It seems true ordinarily that conversion can be maintained only if the plaintiff can show possession or a right to immediate

possession of the item converted at the time of the alleged conversion.[1] Prosser, *supra* at 93–95. Thus, it has been held that a secured party cannot recover in conversion for unauthorized disposition of collateral by the debtor unless the secured party's right to possession has accrued under Code § 9–503, that is, unless a default has occurred.[2] *Empire Fire and Marine Insurance Co. v. First Nat'l Bank of Arizona*, 26 Ariz.App. 157, 546 P.2d 1166 (1976); *Royal Store Fixture Co. v. New Jersey Butter Co.*, 114 N.J.Super. 263, 276 A.2d 153 (1971). On the other hand, some cases seem to hold that, in situations similar to the one at bar, Code § 9–306(2) and Official Comment 3 thereto empower the secured party to bring a conversion action by showing only that a valid security interest existed and that the disposition was unauthorized. *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726 (1967); *White-Sellie's Jewelry Co., Inc. v. Goodyear Tire & Rubber Co.*, 477 S.W.2d 658 (Tex.Civ.App.1972).

In most cases, any distinction between the two positions just mentioned is moot, because the security agreement defines de-

1. Criticism has been leveled at the view that a right to immediate possession in the plaintiff is an absolute prerequisite to a conversion action. *See Production Credit Ass'n of Chippewa Falls v. Equity Coop Livestock Sales Ass'n*, 82 Wis.2d 5, 261 N.W.2d 127, 129 n. 13 (1978); W. Prosser, Law of Torts 95–96 (4th ed. 1972); Justice, *Secured Parties and Judgment Creditors—The Courts and Section 9–311 of The Uniform Commercial Code*, 30 Business Lawyer 433, 438–41 (1975). These critics generally suggest that a plaintiff should be entitled to recover in conversion for *significant wrongful interference* with property in which he has an interest whenever such an interference justifies a suit to recover the property's full value. We neither accept nor reject this proposition, but we point out that defendant's disposition of the collateral in the instant case, if wrongful (i. e. unauthorized), was clearly significant enough to justify a suit for conversion under this approach. *See* note 2, *infra*.

2. Some courts and commentators adhere to the view that conversion also entails something *more* than just the debtor's unauthorized disposition of collateral constituting, or occurring after, a default. *See Citizens Bank of Lavaca v. Perrin & Sons, Inc.*, 253 Ark. 639, 488 S.W.2d 14 (1972); *Production Credit Ass'n of Chippewa Falls v. Equity Coop Livestock Sales Ass'n*, 82 Wis.2d 5, 261 N.W.2d 127, 132 n. 20 (1978); Justice, *Secured Parties and Judgment Creditors—The Courts and Section 9–311 of The Uniform Commercial Code*, 30 Business Lawyer, 433, 441–43 (1975). *But see Murdock v. Blake*, 26 Utah 2d 22, 484 P.2d 164 (1971). This view derives support from U.C.C. § 9–311, which provides that a "debtor's rights in collateral may be voluntarily or involuntarily transferred . . . notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default." If the debtor's rights in the collateral are expressly so alienable, runs the argument, it seems unlikely that their transfer alone was intended invariably to constitute a conversion. Also rec-

oncilable with this view is U.C.C. § 9–306(2)'s Comment 3, which points out that since a security interest continues in collateral disposed of by the debtor without authority, the secured party may "*in an appropriate case* maintain an action for conversion" (emphasis added).

In *Citizens Bank of Lavaca, supra*, the Arkansas court held that causing an attachment and sale of collateral is not a conversion *per se*. The court found on conversion on the facts before it because the collateral was as accessible to the secured party in the buyer's hands as it would have been had the debtor sold it, which § 9–311 gave him the right to do. But in *Royal Store Fixture Co. v. New Jersey Butter Co.*, 114 N.J.Super. 263, 276 A.2d 153 (1971), removing the collateral from the state after purchasing it at a judicial sale was held to constitute conversion. Thus it could be said that, according to these cases, the "something more" needed to turn an unauthorized disposition of collateral by the debtor into a conversion is a significant wrongful interference with the secured party's rights (similar to that discussed in note 1, *supra*). *See* Justice, *supra*, 441–42.

In the instant case, defendants' sale of the tobacco through their warehouse to buyers who could be expected to process it, commingle it with other tobacco, and otherwise render it unidentifiable and inaccessible to plaintiff, was clearly a significant interference with any rights plaintiff may have had in the tobacco. Whether such an interference is a necessary element of conversion in cases like this or whether the debtor's unauthorized disposition in default is enough of itself to constitute the tort, then, the dispositive issue in this case is the same: Was the debtor's disposition of the collateral unauthorized and hence a default under the security agreement? Accordingly, in this opinion we confine ourselves to that issue and do not decide whether a significant wrongful interference with the secured party's rights in collateral is a prerequisite to conversion liability under Tennessee law.

fault to include any unauthorized disposition of the collateral. This is also the situation in the case at bar. The security agreement, in effect, makes disposition of the collateral by the debtor without plaintiff's written consent a default at plaintiff's option. Because plaintiff has brought this suit, we may assume that he has elected to treat the sale of the tobacco as ·a default. Thus, we need not decide whether default is a necessary prerequisite to a suit for conversion by the secured party, or whether an unauthorized disposition of collateral by the debtor is enough of itself, for if the latter has occurred in this case the former has also. Plaintiff's right to bring this suit for conversion of the tobacco depends simply on whether or not plaintiff authorized its sale.

■ We think that the record in this case is deficient and unclear on the issue of whether plaintiff authorized the sale of the tobacco, and consequently on the issue of his right to bring this conversion action. It appears, however, that this deficiency was not due to culpable negligence by the parties but, indeed, the point may have been clear to all concerned in the trial court and the answer assumed by them, although not explained in the record. Further, introduction of the security agreement itself and the fact of sale by the debtor raise the problem tacitly, and indicate the necessity of further proof for its resolution. Accordingly, we are remanding the case for further proceedings to correct this deficiency under T.C.A. § 27–329, so that a proper and just result may be reached. See *Wood v. Neely*, 66 Tenn. 586 (1874); *Stokely v. Southern Railway Co.*, 57 Tenn.App. 271, 418 S.W.2d 255 (1967). We will now proceed to state our view of the case and to outline the clarifications we think necessary so that a proper result may be reached quickly and efficiently on remand.

■ Initially, we agree with the Chancellor that consideration of the question of perfection of plaintiff's security interest under the Code, with its attendant problems of filing and constructive notice, is unnecessary to a decision in this case. The Code provides that if the debtor's disposition of the collateral is unauthorized, the security interest continues in that collateral as well as in its proceeds. T.C.A. § 47–9–306(2). A security interest that does continue will be valid against a third party unless he can show his priority under T.C.A. § 47–9–301 or § 47–9–307. Defendants fit under none of the provisions of § 47–9–301, for they are neither secured parties nor lien creditors, nor were they without knowledge of the security interest of plaintiff. Nor can defendants bring themselves within the provisions of § 47–9–307, which does not apply in the case of farm products sold by a person engaged in farming operations. In effect, then, defendants' actual notice of plaintiff's security interest in the tobacco is enough to make the security interest operate as though it were perfected as to defendants, who are subject to it provided that the sale was unauthorized. The question is thus whether plaintiff authorized the sale and perfection is unimportant.

■ While perfection is not necessary for plaintiff to assert its security interest in the tobacco in this conversion action against defendants, existence of a *valid security agreement* is a prerequisite to such assertion. Without this, plaintiff would have no rights at all in tobacco or proceeds. The "situs" rule of Code § 9–102 has made Tennessee's version of the Code applicable to the events in this case that occurred while the collateral was located in Tennessee, also the site of defendant's warehouse. See T.C.A. § 47–9–102(1), and Official Comment 3 thereto. Since the transaction intended to create a security interest between plaintiff and the debtor Carter took place in Kentucky, however, that state's version of the Code governs the existence and validity of the security interest itself. Kentucky Revised Statutes § 355.9–102(1). Under the applicable legal provisions, we think that the security interest in this case is valid.

■ The steps that must be taken by the parties as a prerequisite to the exist-

ence of a security interest enforceable against the debtor are stated in K.R.S. §§ 355.9-203—355.9-204, and may be summarized as follows. The parties must:

(1) Enter into a security agreement,

(2) Reduce so much of that agreement to a writing as is necessary to satisfy 9-203 (which also requires that the debtor sign this writing), or give possession of the collateral to the creditor,

(3) Have the debtor acquire rights in the collateral,

(4) Have the secured party give value.

J. White & R. Summers, Uniform Commercial Code § 23.2 (1972). Defendants' major challenge to the security interest in this case is that it does not sufficiently describe the crops and the land on which they were grown, as is required by K.R.S. § 355.9-203. Light is shed on the problem of what constitutes a sufficient description for purposes of this section by K.R.S. § 355.9-110, which reads as follows:

For the purposes of this article any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described.

The official comment to this section indicates that it is intended to reject the requirement of detailed description and make the test of sufficiency simply that the description "make possible the identification of the thing described." With this test in mind, we conclude that the description of collateral, quoted above, in the instant security agreement was sufficient to make it valid under the Code. An objective reading of the agreement could hardly fail to produce the conclusion that plaintiff was claiming a security interest in half of the 5200 pounds of tobacco grown on Dewey Allen's farm. The word "proceeds" is sufficient to cover any proceeds by the express terms of K.R.S. § 355.9-203. The agreement also complies with the other requirements of §§ 355.9-203 and 355.9-204. Accordingly, we would overrule defendants' objections to the security agreement and hold it valid.

Defendants' arguments that the financing statement filed by plaintiff fails to comply with K.R.S. § 355.9-402 and other provisions need not be treated for, as we have pointed out, perfection of the security interest is irrelevant on these facts. Since defendants were subject to the security interest in the tobacco if its disposition by the debtor was unauthorized, the only important question other than that of whether the sale was authorized is that of the validity of the security agreement. We have already concluded that the agreement was valid.

Again, however, a valid security agreement is not enough. Defendants were subject to the security interest in the tobacco only if the sale was not authorized by plaintiff, which under the Code would mean that the security interest continued and under this security agreement would also mean a default. It is crucial to know whether the debtor was authorized to sell this tobacco and, if so, whether the authorization was properly made in writing according to the terms of the security agreement, in order to know if plaintiff may maintain this action for conversion. The record does not tell us this, although it does establish the terms of the security agreement and the fact of a sale by Carter. On remand, the missing details as to authorization of the sale should be easily supplied, and the case quickly and finally resolved.

■ The Chancellor's findings, supported by the evidence, already establish the requisite intent and interference with property by defendants to constitute conversion. The finding that they had actual notice, also supported by the evidence, precludes further assertion by defendants that they are not liable because they acted in good faith and without notice. On remand the Chancellor need only determine whether the sale was properly authorized by plaintiff. If not, plaintiff is entitled to a judgment against defendants for conversion of the tobacco in the amount of its fair market value at the time of sale. But if

the sale was authorized, there was no conversion of the *tobacco* by defendants, since plaintiff's security interest would not continue after an authorized disposition by the debtor. In such a case, however, plaintiff would retain a security interest in identifiable proceeds.

We have assumed through most of this opinion that plaintiff is suing for conversion of the tobacco. We realize, however, that a claim might be made for proceeds instead, and plaintiff ought to make clear on remand exactly which theory he is pursuing, though there is little difference in the outcome either way. An unauthorized disposition of the tobacco, coupled with defendants' payment of the proceeds to Carter, would give plaintiff the right to a judgment for conversion of the proceeds in their money amount. This brings us to one final, minor point: it is stipulated that defendants paid $2,288.29 over to Carter as proceeds from the sale of his tobacco, while the amount of the decree against defendants is $2,289.00. This, too, should be clarified on remand.

Remanded with instructions.

SHRIVER, P. J., and TODD, J., concur.