IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 10, 2019 Session

## ARNOLD RAY PARKER v. WILLIAM H. CLAYTON

Appeal from the Circuit Court for Perry County
No. 2015-CV-8    Michael Binkley, Judge

_____

### No. M2017-02556-COA-R3-CV

_____

In this suit for conversion, a truck owner alleges that his friend converted his truck for the friend's own use and the friend asserts that the owner gave him the truck as a gift. The trial court found the owner was more credible and concluded the friend was liable for conversion. The court awarded the owner damages, including lost earnings to compensate him for the time he was unable to earn a living by driving his truck. The friend appealed, claiming the court erred by awarding the owner more than the dollar amount set forth in the complaint. We affirm the trial court's judgment in most respects, but we modify the damages award to conform to the requested amount.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Samuel W. Hinson, Lexington, Tennessee, for the appellant, William H. Clayton.

Terry L. Wood, Adamsville, Tennessee, for the appellee, Arnold Ray Parker.

### OPINION

#### I. FACTUAL BACKGROUND

This case concerns the ownership of a 2005 Volvo semi-truck that Arnold Ray Parker purchased in September 2012. The parties are the only ones who testified at trial, and they presented vastly different descriptions of the events that led up to the dispute. Because Mr. Parker is the plaintiff, we will discuss his testimony first.

<u>Mr. Parker's Evidence</u>

Mr. Parker obtained his commercial driver's license ("CDL") in April or May of 1978 and was employed by K&B Transport, Inc. ("K&B"). Mr. Parker was preparing to undergo surgery in late 2013, and he was not working as a commercial driver at that time. Mr. Parker has known William H. Clayton since 1970, when Mr. Parker was about eighteen years old. Mr. Clayton had been good friends with Mr. Parker's father. Mr. Clayton approached Mr. Parker in January or February of 2014 and asked for help getting his CDL. Mr. Clayton explained that he would have to pay between $4,000 and $5,000 if he went to truck driving school. Mr. Parker believed Mr. Clayton had formerly been licensed as a commercial driver and that he had lost his CDL due to a charge for driving under the influence ("DUI"). Mr. Parker thought Mr. Clayton simply needed to refresh his skills before applying to have his CDL reinstated. Mr. Parker explained that he would not be able to work with Mr. Clayton for about twelve weeks due to his upcoming surgery and anticipated recovery time, but he agreed to help Mr. Clayton once he was able to drive again.

Mr. Parker was living in Adamsville, Tennessee when he had his surgery, and he was looking for another place to live around the time that he was ready to begin driving again. Mr. Clayton offered to let Mr. Parker live with him and his wife in Perry County, and Mr. Clayton helped Mr. Parker move his recreational vehicle ("RV") to Mr. Clayton's property. Mr. Parker moved all of his belongings to Mr. Clayton's property in mid-May 2014.

Mr. Parker agreed to let Mr. Clayton drive his truck while Mr. Clayton became familiar again with driving a tractor trailer. Mr. Parker suggested that Mr. Clayton apply to work for the trucking company that employed Mr. Parker, K&B, and the two men agreed to share the money they earned driving Mr. Parker's truck for K&B. Mr. Parker testified that he told Mr. Clayton the following with regard to Mr. Clayton's being allowed to drive his truck:

> I explained to him that before he would be allowed to train that he would have to be shown as part owner of the truck. That I would be required to put his name on the title and, after a period, that I would pay his expenses through a period of time, and when he got his commercial driver's license, if he was capable of getting them without any errors, no accidents or anything that could cause my death or his death, that I would regain my truck title back to me, that he would sign it over to me.

On May 15, 2014, Mr. Parker arranged to have Mr. Clayton's name added to the title of his truck. Mr. Parker testified that the clerk asked who was going to pay the transfer tax, and Mr. Parker said he would. According to Mr. Parker, "Mr. Clayton instructed her to write down 'gift' on [the form]." The Affidavit of Non-Dealer Transfers

of Motor Vehicles and Boats form shows that the box next to "gift transfer" was checked. The form includes a section that is to be completed in cases of a "gift or low selling price." Mr. Parker testified that in the space next to the instruction that states, "If the sales price is lower than the average value please indicate the reason for the low price," the clerk wrote: "gift from friend of 50 years." Mr. Parker stated that the clerk added this language after he signed the affidavit. The title issued on May 15, 2014, identified the owners as "Ray Parker or William Clayton."

At trial Mr. Parker was asked whether he intended to give Mr. Clayton his truck or whether he was "just putting his name on the title for operational purposes." Mr. Parker responded: "Mr. Clayton and I had a handshake agreement that I would have to put his name on the title for him to become part of the company and - - which would hold him responsible for his actions while he was in that truck." Mr. Parker continued, stating: "It was understood that after the efforts were made to drive the truck for him to obtain his commercial license that I would get that truck title back." Once Mr. Clayton obtained his CDL, the parties were going to split the profits made from driving the truck. Mr. Parker said that he never told Mr. Clayton that he was giving Mr. Clayton the truck as a gift. Mr. Parker explained further as follows:

Q: Again, there was never any additional agreements made between you and Mr. Clayton as to what would happen to the truck or any profits or reimbursements should Mr. Clayton not be successful in getting his license, right?

A: We did have - - I did make a statement to him that when he got his license that we would get our title back. Me being we. I would get my title back. I would take ownership of the truck and he was already on the payroll. He would work for me as the owner and he would get - - he would fuel, see that the oil was changed, it was greased, fuel filters changed. He would see that the maintenance is kept up on the truck - - and everything that was left at the end of the week, after he turned in his fuel tickets, then he would be written a check for the difference of the money that came [in] and his expenses that he paid out of the credit card or out of his pocket.

In July 2014, Mr. Parker arranged for the truck to be insured, and the insurance was in Mr. Parker's name alone. That same month, Mr. Parker and Mr. Clayton opened a joint bank account and each deposited $5,000 into the account. Mr. Parker and Mr. Clayton entered an employment agreement with K&B that listed both parties as the owners and controllers of the truck. Mr. Parker and Mr. Clayton agreed to share equally the wages K&B paid them and the truck costs they incurred while driving together.

Mr. Parker testified that he and Mr. Clayton went out on the road together starting on July 28 or 29, 2014. They picked up a trailer in Jonesboro, Arkansas that was to be

delivered to Madison, Wisconsin. Mr. Clayton told Mr. Parker that he knew how to fill out a logbook, so Mr. Parker let Mr. Clayton take care of his own logbook without any oversight in the beginning. Once they were in Oregon, Mr. Parker realized that Mr. Clayton's logbook did not match his own and that Mr. Clayton had made errors that needed to be corrected and resubmitted to K&B. Mr. Parker soon realized that Mr. Clayton did not have the experience driving a semi-truck with a trailer attached that he thought Mr. Clayton had, so Mr. Parker set about teaching Mr. Clayton everything he thought Mr. Clayton needed to learn to obtain his CDL. Mr. Parker noticed, even with coaching on how to operate the truck, that Mr. Clayton was having the following problems:

> I was disappointed in his knowledge of handling a long vehicle. He couldn't - - he would not pull it through a fuel island. He would stop prior to pulling it through and I would have to get out and move the truck up onto the fuel island, he wouldn't operate the credit card process, and he would not back a trailer up.

Mr. Parker explained that daily inspections of the truck were necessary. He asked Mr. Clayton to assist him with the inspections, but Mr. Clayton did not perform one inspection on his own in the four weeks the parties were on the road together. Mr. Parker testified that when he asked Mr. Clayton why he was not performing the requisite inspections, Mr. Clayton responded that "[h]e's got neuropathy and his feet bothered him, and he didn't feel like walking around, or, 'I don't feel good today' or whatever the excuse."

At some point during the month Mr. Parker and Mr. Clayton spent together on the road, Mr. Parker realized that Mr. Clayton had a problem with alcohol. Mr. Parker testified that Mr. Clayton drank too much in Missoula, Montana and was unable to drive the next day because he was still too inebriated from the previous night. Then, when they were in Florence, South Carolina, Mr. Clayton went into a bar while they were waiting for the truck to be serviced. Mr. Parker went into the bar later that evening to find Mr. Clayton and tell him the truck's status, but Mr. Clayton was not in the bar. Mr. Parker spent a few hours looking for Mr. Clayton and eventually returned to the truck to go to sleep.[1] The truck's problem could not be fixed at the shop in Florence, so Mr. Parker planned to leave the next morning to find another shop where the work could be done. Mr. Parker did not see Mr. Clayton again until the next morning, when someone else using Mr. Clayton's phone called Mr. Parker to notify him of Mr. Clayton's whereabouts. Mr. Parker learned that Mr. Clayton had gotten into an altercation the previous night that left him with a bruised brow and possibly some broken ribs. Mr. Clayton lost his glasses

---

[1]The truck had two beds, and the parties generally slept in the truck when they were on the road.

during the altercation and did not have a second pair with him, so he was unable to do any more driving until they returned to Perry County, Tennessee a week or so later.[2]

When Mr. Parker and Mr. Clayton returned to Tennessee on Thursday, August 28, 2014, Mr. Parker informed Mr. Clayton that he would "pay Mr. Clayton off" the following morning because Mr. Clayton had "no ability" to get a CDL. According to Mr. Parker, Mr. Clayton was not doing anything that was required for him to obtain a CDL; he had not even picked up the safety manual that Mr. Parker had left on the truck's dashboard for Mr. Clayton to read. Mr. Parker stated that the safety manual was "required reading." Mr. Parker then took the truck to a repair shop, where Mr. Clayton's wife met them and took Mr. Clayton home.

The following day, unbeknownst to Mr. Parker, Mr. Clayton withdrew over $7,000 from their joint bank account, leaving a nominal amount in the account. Mr. Clayton had possession of the truck's title,[3] and on Friday, August 29, he had the truck's title reissued in his name alone. He forged Mr. Parker's name on an Affidavit of Non-Dealer Transfers of Motor Vehicles and Boats form, falsely swearing that Mr. Parker had transferred the truck to him on August 28. When Mr. Parker went to Mr. Clayton's residence to collect his RV, motorcycle, and personal items, Mr. Clayton refused to let Mr. Parker have any of his things unless Mr. Parker gave Mr. Clayton the keys to the truck. Mr. Parker gave Mr. Clayton the keys in order to collect his personal belongings, his motorcycle, and his RV. Mr. Parker then sued Mr. Clayton for conversion of his truck.

Mr. Clayton's Evidence

Mr. Clayton denied any wrongdoing and asserted that Mr. Parker had given him the truck as an inter vivos gift. Mr. Clayton testified that Mr. Parker told him his eyes had been damaged from welding and he did not think he would be able to pass a physical examination for a driver's license:

> [W]e were talking about it and he said, My eyes are going bad. He said, I'm going to have to have this operation. He said, I don't think I'm going to be qualified to drive [my truck]. And he said, I would rather you have it as anybody, so I'll just give it to you.

---

[2]Mr. Parker testified that he had told Mr. Clayton before they initially left Perry County to pick up their first load that he needed to bring a spare pair of eyeglasses with him because he had a vision restriction on his driver's license.

[3]Mr. Parker explained that Mr. Clayton had asked to hold onto the title and asked Mr. Parker to sign the back of the title as security for the return of Mr. Clayton's initial $5,000 deposit into the joint bank account. Mr. Parker agreed, with the understanding that he would get the title back once Mr. Clayton obtained his CDL, and the title would then be reissued in Mr. Parker's name alone.

Mr. Clayton testified further:

Q: Who approached who first about the agreement between you and Mr. Parker? Did he approach you or did you approach him?

A: He approached me. Because when I got the truck he said, It's your truck. Do with it what you want to.

Q: Okay. All right.

A: I said, What all on that truck is mine? And he said, Everything that's in it or on it is yours, the whole thing.

Q: That's what Mr. Parker told you?

A: Those are his words. He said, Everything that's in it or on it. We didn't talk about an agreement of any kind as far as me and him involved with a joint venture.

Q: So originally you and Mr. Parker, you-all didn't have -- nothing was mentioned about him training you or anything like that; is that right?

A: No.

Q: All right. So when did that conversation happen about Mr. Parker training you to operate that vehicle?

A: Well, when we started talking about what I was going to do with the truck. Because he said, Do whatever you want to with the truck, it's your truck. And I told him about this friend of mine that had the run from Florida down here and he said, Well, he said, I can tell you how you can make a lot more money with that truck, if you'll lease it onto this company that I used to have it leased onto.

Q: What company was he talking about?

A: K&B.

Q: K&B?

A: Yeah. And I said, Well, what have you got to do to get it leased on? He said, Well, first of all, they won't lease it to you because you don't have your commercial driver's license. And he said, If they lease it on - - I'd

have to have my name back on the title. This was after we had already changed the title over to my name and everything. He said, They won't lease it on unless my name is on the title because you don't have a commercial driver's license. But, he said, You'll be able to make a lot more money with them. And he said, If you'd be willing to do that, I'd be willing to get on the truck and ride with you. And he said, I can train you with everything you need to know, because you already know a lot. He said, I could train you where you can get your commercial driver's license and save you four or $5,000 and, in return, I want half of what the truck makes. And I said, Well, that doesn't sound too bad, so that's what we decided to do.

Mr. Clayton insisted during the trial that Mr. Parker had transferred the truck's title to him free and clear before the title was changed to include both of them as owners. Mr. Clayton was unable to present any proof of this claim, however. The record includes the results of a document request made on October 24, 2014, to the Tennessee Department of Revenue, Vehicle Services Division, for a complete history of the truck at issue in the name of either Mr. Parker or Mr. Clayton. The results of that document request showed that the truck was never titled in Mr. Clayton's name alone until August 29, 2014, when Mr. Clayton had the title changed to reflect him as the sole owner of the truck.

## II. PROCEDURAL BACKGROUND

In November 2014 Mr. Parker filed a civil summons against Mr. Clayton in general sessions court. The general sessions judge dismissed the case on jurisdictional grounds in May 2015, and Mr. Parker filed an amended complaint in circuit court in June 2015. Mr. Parker sought the return of his truck, his tools and other personal items stored in the truck, some personal items left at Mr. Clayton's residence, loss of income due to the inability to drive his truck, compensatory damages, if any, to his truck, and punitive damages. Mr. Clayton denied any wrongdoing, claiming instead that Mr. Parker had given him the truck as an inter vivos gift.

Following the presentation of evidence on June 6, 2017, the trial court filed its decision on December 1, 2017. The trial court's findings of fact included the following:

17. Mr. Parker and Mr. Clayton agreed Mr. Clayton would be employed as a driver for the same company for which Mr. Parker worked, but in order to do so, Mr. Clayton had to become part owner of the truck. In order to further their plan, a new title to the truck was issued in the names of "Ray Parker or William Clayton, Jr." Somewhere in the process, Mr. Parker signed a document in the clerk's office stating the transfer was a "gift" based upon instructions from the clerk. Once the title was issued, Mr.

Clayton asked Mr. Parker to go ahead and sign the title so he would have some security for the $5,000 contribution made to the joint checking account established by Mr. Parker and Mr. Clayton for their partnership. Mr. Parker trusted Mr. Clayton and signed the title for this limited purpose only and allowed Mr. Clayton to keep possession of the title.

18. Mr. Parker told Mr. Clayton he would have to put Mr. Clayton's name on the title of Mr. Parker's truck in order to facilitate the ability of Mr. Clayton to be employed later as a truck driver for the same company for which Mr. Parker had worked.

19. It is agreed Mr. Clayton would become part owner of Mr. Parker's truck by placing Mr. Clayton's name on the title. This would facilitate and provide an easy transition for Mr. Parker's former company, K & B Transport, Inc., to make automatic deposits into a joint checking account to be opened by Mr. Parker and Mr. Clayton.

. . . .

24. Mr. Clayton confirmed Mr. Parker would get his title back and that essentially, Mr. Clayton was going to be working for Mr. Parker.

25. In order to continue with the steps toward completing the documentation for the joint venture, Mr. Parker and Mr. Clayton had a new title for Mr. Parker's truck prepared with both parties' names on the new title.

26. There was no lien reflected on the new title.

27. In addition, there was an Affidavit of Non-Dealer Transfers of Motor Vehicles and Boats attached to the new title indicating the transfer of title adding Mr. Clayton's name and was done as a "gift," as indicated on the Affidavit.

28. Mr. Parker states the item added in the box area of the Affidavit indicating the transfer was a "gift from friend of 50 years" was written on the Affidavit by the court clerk, who assisted with the preparation of the Affidavit, and was done so after the documents were signed on May 15, 2014 by Mr. Parker and Mr. Clayton.

29. Mr. Parker claims he never "gifted" his truck to Mr. Clayton.

30. Mr. Clayton, on the other hand, stated the Affidavit of Non-Dealer Transfers of Motor Vehicles and Boats meant what it said and the parties agreed Mr. Parker gifted the entire vehicle to Mr. Clayton on May 15, 2014.

. . . .

32. Mr. Clayton was adamant there was either another exhibit, or another title, or a copy of a title somewhere, indicating the truck was given to Mr. Clayton by Mr. Parker free and clear, as a gift. Mr. Clayton insisted, during his testimony, that there was in fact another exhibit or title. Even though Mr. Clayton was given plenty of opportunity to search for the missing exhibit or title, the fact of the matter is there was no other exhibit or title in existence as indicated by Mr. Clayton.

The trial court resolved the disputed testimony regarding whether Mr. Parker transferred the truck to Mr. Clayton as an inter vivos gift in favor of Mr. Parker, whose testimony it found "more credible, articulate, detailed and reasonable regarding this particular point." Specifically, the trial court found that "Mr. Parker and Mr. Clayton agreed Mr. Clayton would return Mr. Parker's truck to Mr. Parker after Mr. Clayton obtained his commercial driver's license." The court rejected Mr. Clayton's testimony regarding Mr. Parker's poor eyesight, finding "the facts showed Mr. Parker passed his next eye exam without any problems" and "[v]ision tests were passed by Mr. Parker that year [2014] and every year thereafter." The court also found that "Mr. Clayton's responses to questions on direct examination were very poor" and that "overall, Mr. Clayton was not a credible witness." The court found Mr. Parker, however, "to be a credible witness."

The trial court's factual findings regarding the termination of the parties' relationship included the following:

87. On Thursday, August 28, 2014, the parties arrived in Nashville, Tennessee. Mr. Parker told Mr. Clayton he could not complete the agreement because Mr. Clayton simply was incapable of performing the responsibilities and duties of an over-the-road truck driver, and essentially, could not perform even the very basic and fundamental steps of moving towards obtaining a commercial driver's license.

88. It was clear to Mr. Parker that Mr. Clayton would clearly fail at any attempt to obtain a commercial driver's license based upon not only Mr. Clayton's apparent inability to perform even the smallest tasks of operating a tractor/trailer, but his difficulty with drinking alcohol to excess just about every time he drank, which would ultimately lead to fights and other

trouble, which clearly interfered with Mr. Clayton's ability to become a commercial truck driver.

89. The parties ended their relationship on Thursday, August 28, 2014.

90. After parting ways, it was later learned Mr. Clayton stopped in Waverly, Tennessee to visit the local bank there and had taken a debit in the amount of $7,500 from the joint checking account he had with Mr. Parker, leaving a balance in that joint account in the sum of $25.80.

91. When Mr. Parker realized the removal of the $7,500 from the joint checking account, he closed the account.

92. Thereafter, Mr. Parker kept all residual gross receipts that came into K & B Transport, Inc. which were unable to be routed to the joint checking account because it had been closed.

. . . .

99. During Mr. Parker's visit to Mr. Clayton's home to retrieve his personal belongings, Mr. Clayton stated to Mr. Parker he was not going to give Mr. Parker anything until he received the truck.

100. Mr. Clayton claimed the truck was his and he was keeping it since it was a "gift" from Mr. Parker.

101. Reluctantly, Mr. Parker gave Mr. Clayton the two keys to the truck and received his RV, motorcycle, and other large items of personal property from Mr. Clayton.

102. At that time, Mr. Parker left all other remaining personal items in his truck, which were considerable.

The trial court concluded as a matter of law that Mr. Parker did not transfer the truck to Mr. Clayton by inter vivos gift, writing:

Based upon the testimony of the parties to this cause, it is clear that the elements of an inter vivos gift of the vehicle and all personal property in the vehicle from Mr. Parker to Mr. Clayton have not been met. It is Mr. Clayton's burden of proof to show by clear and convincing evidence of an inter vivos gift. The testimony of the alleged beneficiary, Mr. Clayton, has not been met. The testimony of Mr. Parker on this issue totally contradicts Mr. Clayton's testimony. Based upon the totality of the circumstances, the

proof is clear that Mr. Parker had no present intent at any time to make a gift to Mr. Clayton. Although Mr. Clayton has argued that Mr. Parker made a delivery of the gift to him, Mr. Parker did not surrender complete dominion and control of the truck or other items of personalty to Mr. Clayton. Mere possession of the property by Mr. Clayton at issue is not enough. Neither element—intent nor delivery, has been met by clear and convincing evidence much less by a preponderance of the evidence.

The court then concluded that Mr. Parker proved his claim for conversion, writing:

1. In reviewing the elements of conversion, the Court concludes that by Mr. Clayton's actions as set forth above, he clearly and with the requisite intent converted Mr. Parker's vehicle, along with all of the personalty inside of the vehicle, to Mr. Clayton's own personal use and benefit.

2. The Court finds that Mr. Clayton intentionally exercised improper dominion and control over the property of Mr. Parker, to-wit: his vehicle as well as all personalty associated with the vehicle.

3. In defiance of the true owner's rights, the Court concludes that based upon Mr. Clayton's statements and his lack of credibility with regard to indications on the title to the truck, the greater weight of the evidence as well as considering the lack of credibility of Mr. Clayton in comparison to the good credibility of Mr. Parker, Mr. Clayton was defiant of Mr. Parker's ownership in the truck as well as all personalty within the truck.

The trial court then turned to the issue of damages. Mr. Parker testified that the truck had a value of $20,000. He also testified about the tools and other items he kept in the truck, and he introduced into evidence a four-page list of personal items that he claimed were in the truck when Mr. Clayton demanded the keys. Prior to trial Mr. Parker was able to inspect the truck, and none of his tools or other personal items were still there. Mr. Parker valued his missing personal property at $6,087, which value Mr. Clayton did not dispute.

Mr. Parker testified about his lost income as a result of not being able to drive the truck. Mr. Parker stated, and the court found, that his approximate average gross income after expenses was $10,000 per month. Mr. Parker testified that he had been earning approximately $4,000 working other jobs in the thirty-three months that had passed from the time Mr. Clayton took possession of the truck until trial. Thus, the trial court concluded, Mr. Parker's lost income during this period was $6,000 per month, which totaled $198,000 for the thirty-three months Mr. Parker was deprived of his truck. The trial court determined that Mr. Parker was entitled to the following damages:

- 11 -

$198,000 — gross personal income for lost wages;
  20,000 — value of the truck;
   6,087 — value of Mr. Parker's personal property;
  1,113.99 – to balance parties' financial responsibility based on their agreement to
           split income and expenses during training period;[4]

$225,200.99 TOTAL DAMAGES

Mr. Clayton appeals the trial court's judgment, arguing that the court erred by (1) ruling that the truck was not a gift, (2) awarding Mr. Parker possession of the truck when it failed to rule on whether the truck was the property of the parties' partnership/joint venture, and (3) awarding Mr. Parker $225,200 in damages when Mr. Parker requested only $50,000 in total damages.

## III. ANALYSIS

### A. Standard of Review

In non-jury cases such as this, we review the trial court's findings of fact in accordance with Tenn. R. Civ. P. 13(d). *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006); *Curry v. City of Hohenwald*, 223 S.W.3d 289, 291 (Tenn. Ct. App. 2007). This rule provides that an appellate court is to review a trial court's findings of fact de novo upon the record, accompanied by a presumption of correctness of the findings unless the preponderance of the evidence is to the contrary. TENN. R. APP. P. 13(d); *Blair*, 197 S.W.3d at 684; *Curry*, 223 S.W.3d at 291. We review questions of law de novo, affording the trial court's legal conclusions no presumption of correctness. *Blair*, 197 S.W.3d at 683. When reviewing issues based on the witnesses' credibility, appellate courts "afford trial courts considerable deference" because "trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). "'[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.'" *Id.* (quoting *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)). Evidence is not "clear and convincing" unless it "eliminate[s] any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* at 692-93 (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)).

---

[4]The parties stipulated to an evidentiary document reflecting the amounts of money deposited into the parties' joint bank account and the amounts withdrawn by each of the parties. After Mr. Clayton withdrew over $7,000 from the joint account, K&B deposited an amount of money that balanced the parties' liabilities to one another with the exception of $1,113.99, which Mr. Clayton still owed to Mr. Parker.

B. Inter Vivos Gift

A person contending an inter vivos gift was made to him or her carries the burden of proving (1) the donor intended to make the gift and (2) the donor delivered the gift to the donee. *Pamplin v. Satterfield*, 265 S.W.2d 886, 888 (Tenn. 1954); *see also Arnoult v. Griffin*, 490 S.W.2d 701, 710 (Tenn. Ct. App. 1972) (citing *Dodson v. Matthews*, 117 S.W.2d 969, 972 (Tenn. Ct. App. 1938)); *First Nat'l Bank v. Howard*, 302 S.W.2d 516, 519 (Tenn. Ct. App. 1957). The donor's intent "must be determined from all the circumstances." *Arnoult*, 490 S.W.2d at 710. Our Supreme Court has explained that to establish the delivery component, the donee must prove that the donor surrendered "complete dominion and control of the gift." *Pamplin*, 265 S.W.2d at 888; *see also In re Philip Roseman 2012 Irrevocable Gift Trust*, No. M2017-01994-COA-R3-CV, 2018 WL 3217245, at *3 (Tenn. Ct. App. July 2, 2018); *Evans v. Evans*, No. 39, 1986 WL 5893, at *2 (Tenn. Ct. App. May 23, 1986). The testimony of the alleged beneficiary is not enough to prove a gift was made. *Union Planters Bank, N.A. v. Shepard*, No. W2002-01188-COA-R3-CV, 2003 WL 21729443, at *4 (Tenn. Ct. App. July 14, 2003) (citing *Atchley v. Rimmer*, 255 S.W. 366, 369 (Tenn. 1923)). "Mere possession of the subject property is not evidence of ownership or of delivery of a gift" in the absence of evidence showing that the possession is rightful. *Id.* (citing *Atchley*, 255 S.W. at 368-69). Both intent and delivery must be proved by clear and convincing evidence. *Parsley v. Harlan*, 702 S.W.2d 166, 173 (Tenn. Ct. App. 1985) (citing *Ingram v. Phillips*, 684 S.W.2d 954, 957 (Tenn. Ct. App. 1984)); *see also Pamplin*, 265 S.W.2d at 888 (stating that "intention to give and delivery of the subject of the gift must clearly appear"). "Doubts must be resolved against the gift." *Pamplin*, 265 S.W.2d at 888; *see also First Nat'l Bank*, 302 S.W.2d at 519.

Mr. Clayton has failed to prove that Mr. Parker made an inter vivos gift of the truck or its contents to him. Mr. Parker's testimony contradicts Mr. Clayton's testimony regarding Mr. Parker's intent to gift the truck to Mr. Clayton, and the trial court found Mr. Parker more credible than Mr. Clayton. As Mr. Parker testified, he added Mr. Clayton's name to the title to make it easier for Mr. Clayton to be hired by K&B and to facilitate K&B's direct deposit of their paychecks into the parties' joint bank account, and he allowed Mr. Clayton to hold onto the title because Mr. Clayton wanted some reassurance that he would later be able to recoup his initial deposit of $5,000. Mr. Clayton was a friend of Mr. Parker's father whom Mr. Parker had known since he was eighteen years old, so Mr. Parker had no reason not to trust Mr. Clayton or question his motives. Mr. Parker testified that he intended to take Mr. Clayton's name off the title as soon as Mr. Clayton obtained his CDL. In light of the parties' contradictory testimony, Mr. Clayton was unable to prove Mr. Parker's donative intent by the requisite clear and convincing evidence standard, and doubts are resolved against a finding that a gift was made. Further, Mr. Clayton was unable to prove delivery by clear and convincing evidence. The trial court believed Mr. Parker when he testified that he did not willingly turn the truck over to Mr. Clayton. The only reason Mr. Clayton obtained possession of

the truck was because he insisted Mr. Parker give him the keys before Mr. Clayton would allow Mr. Parker to collect his personal belongings, motorcycle, and RV from Mr. Clayton's residence. Mr. Parker did not "deliver" the truck to Mr. Clayton; rather, Mr. Clayton took the keys to the truck from Mr. Parker. As the trial court wrote:

> Based upon the totality of the circumstances, the proof is clear that Mr. Parker had no present intent at any time to make a gift to Mr. Clayton. Although Mr. Clayton has argued that Mr. Parker made a delivery of the gift to him, Mr. Parker did not surrender complete dominion and control of the truck or other items of personalty to Mr. Clayton. Mere possession of the property by Mr. Clayton at issue is not enough. Neither element–intent nor delivery, has been met by clear and convincing evidence much less by a preponderance of the evidence.

B. Partnership/Joint Venture

Mr. Clayton contends the trial court failed to address his allegation that the truck became property of the parties' partnership or joint venture. Our review of the pleadings reveals that Mr. Clayton failed to make a counterclaim or raise as an issue at any time during the pendency of this case that the parties had formed a joint venture or partnership or that the truck became an asset of such joint venture or partnership. Because Mr. Clayton failed to raise this as an issue, the trial court had no reason to issue a ruling regarding whether the truck became an asset of any partnership or joint venture. In any event, Mr. Clayton presented no evidence that the truck was either acquired by or transferred to any partnership or joint venture of which he was a member. *See* Tenn. Code Ann. §§ 61-1-203 and -204 (describing when property belongs to partnership as opposed to individual partners); *Finch v. Raymer*, No. W2012-00974-COA-R3-CV, 2013 WL 1896323, at *10 (Tenn. Ct. App. May 6, 2013) (discussing statutes concerning partnership property). We find the trial court did not err in failing to rule on this issue.

C. Damages

Mr. Clayton's final argument concerns the amount of damages the trial court awarded Mr. Parker for Mr. Clayton's conversion of the truck.[5] The amount of damages to award a prevailing plaintiff is a question of fact that we review in accordance with

---

[5]Mr. Clayton does not specifically appeal the trial court's ruling that Mr. Clayton "clearly and with the requisite intent converted Mr. Parker's vehicle, along with all of the personalty inside of the vehicle, to Mr. Clayton's own personal use and benefit." We note that the trial court properly found that Mr. Parker presented a *prima facie* case of conversion by demonstrating the appropriation of his truck by Mr. Clayton for Mr. Clayton's own use and benefit and Mr. Clayton's exercise of dominion over it in defiance of Mr. Parker's right to it. *See Hanna v. Sheflin*, 275 S.W.3d 423, 427 (Tenn. Ct. App. 2008) (setting forth elements of claim for conversion) (citing *Barger v. Webb*, 391 S.W.2d 664, 665 (Tenn. 1965), and *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977)).

Tenn. R. App. P. 13(d). *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005) (citing *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998)). However, "[t]he choice of the proper measure of damages is a question of law to be decided by the court." *Buttrey v. Holloway's, Inc.*, No. M2011-01335-COA-R3-CV, 2012 WL 6451802, at *7 (Tenn. Ct. App. Dec. 12, 2012) (citing *Beaty*, 15 S.W.3d at 827). As a result, we review the trial court's selection of the measure of damages de novo, according the trial court no presumption of correctness. *GSB Contractors*, 179 S.W.3d at 541.

We have described the types of damages available in conversion cases as follows:

"As a general rule, plaintiff's damages in an action for conversion are measured by the sum necessary to compensate him for all actual losses or injuries sustained as a natural and proximate result of the defendant's wrong. However consequential damages must be proved with reasonable certainty. The ordinary measure of damages for conversion is the value of the property converted at the time and place of conversion, with interest. If special damages are pleaded and proved, plaintiff may recover for all injuries or losses sustained as a proximate result of the conversion, but there can be no recovery for losses or injuries which are too remote or uncertain, or which the plaintiff could have avoided by the exercise of ordinary diligence."

*Crowe v. First Am. Nat'l Bank*, No. W2001-00800-COA-R3-CV, 2001 WL 1683710, at *6 (Tenn. Ct. App. Dec. 10, 2001) (quoting *Lance Prods. v. Commerce Union Bank*, 764 S.W.2d 207, 213 (Tenn. Ct. App. 1988) (citations omitted)). When the property that is converted is a vehicle, the plaintiff may be entitled to loss of use damages if the plaintiff can show that he or she reasonably mitigated his or her damages. *Id.* at *5-6.

Although Mr. Clayton argues Mr. Parker is not entitled to any damages because the truck was an inter vivos gift, the gravamen of Mr. Clayton's challenge to the trial court's award of damages is that it exceeds the $50,000 that Mr. Parker sought in the ad damnum clause of his complaint. In his amended complaint, Mr. Parker sought the following damages: the return of his truck and the personal property that he had inside when Mr. Clayton seized control over it; the balance of his half of the funds that were in the joint bank account; and the recovery of his lost income resulting from not having the use of his truck, measured from the time Mr. Clayton took possession of it. His claim for lost income was set forth in two numbered paragraphs as well as in the WHEREFORE clause of his complaint, as follows:

21. Plaintiff has been unable to operate or utilize his truck since Defendant seized its possession and transferred title out of Plaintiff's name.

22.    Plaintiff has damages for [lost] profits from the failure to have access to his truck due to the actions of the Defendant.

. . . .

WHEREFORE, Plaintiff prays that this Court will render judgment in favor of the Plaintiff for an amount to compensate him for any damage to his truck, order and direct that the title of said truck be re-conveyed by the Defendant to the Plaintiff and that possession of said truck and all personal belongings of the Plaintiff be restored to Plaintiff's possession. Plaintiff further prays for judgment in an appropriate amount due to his lost income as a result of the Defendant's wrongful seizure of Plaintiff's truck. For all of the foregoing, Plaintiff seeks damages in the amount of $50,000.00 against the Defendant, for extraordinary relief as the facts merit, his costs, including discretionary costs. Plaintiff prays for such other relief he may be entitled to in the premises whether general or special.

Rather than award Mr. Parker the return of his truck and personalty stored therein, as Mr. Parker requested, the trial court awarded Mr. Parker the value of the truck and personalty in the amount of $26,087 ($20,000 for the truck and $6,087 for the personal property) based on evidence Mr. Parker presented at trial of these items' values. The court also awarded Mr. Parker $1,113.99 to balance the parties' ownership interests in the joint bank account and $198,000 as compensation for his "gross personal income for lost wages," for a total award of $225,200.99. Mr. Clayton does not challenge the trial court's valuation of any aspect of the damages award. Rather, he argues Mr. Parker should be limited to the $50,000 he requested in the WHEREFORE clause of his complaint.

Mr. Clayton contends that a plaintiff is prohibited from recovering money damages in excess of the amount sought in the complaint. In making this argument, Mr. Clayton ignores the allegations Mr. Parker made in paragraphs 21 and 22 of the complaint and Mr. Parker's request for "such other relief he may be entitled to in the premises whether general or special" in the WHEREFORE clause. Thirty-three months passed from the time Mr. Clayton took possession of Mr. Parker's truck until the trial of this case. Thus, Mr. Clayton deprived Mr. Parker of the opportunity to use his CDL and the knowledge he had acquired over the years from being a long distance truck driver to earn a living for close to three years by the time the case was tried.

"[T]he purpose of a complaint is to provide an adverse party with sufficient notice of the allegations the party is called on to answer." *Harrison v. Laursen*, No. 01A01-9705-CH-00238, 1998 WL 70635, at *5 (Tenn. Ct. App. Feb. 20, 1998) (citing *Jasper Engine & Transmission Exch. v. Mills*, 911 S.W.2d 719, 720 (Tenn. Ct. App. 1995)). Although it is true that "[a] judgment or decree in excess of the amount pleaded is void to

the extent of the excess," *Gaylor v. Miller*, 59 S.W.2d 502, 504 (Tenn. 1933), we do not believe Mr. Parker's damages should be limited to $50,000. When he filed the complaint in June 2015, only ten months had passed since Mr. Clayton had taken possession of the truck, and his lost wages at that time, based on the WHEREFORE clause, were just $50,000. It was nearly another two years, however, before the parties were able to try this case. With each month that passed, Mr. Parker suffered additional damages in the form of lost wages. Mr. Clayton knew that Mr. Parker was seeking to recover his lost earnings, and he could have limited Mr. Parker's damages by simply returning the truck. By describing the damages he was seeking with specificity in the complaint, Mr. Parker placed Mr. Clayton on notice, and Mr. Clayton cannot in good faith express surprise when the court awarded Mr. Parker the damages he proved. Mr. Clayton points to nothing in the Tennessee Rules of Civil Procedure that requires Mr. Parker to specify an upper limit of the dollar amount he is seeking to recover as damages. *See* TENN. R. CIV. P. 8.01 (requiring pleading to contain "a demand for judgment for the relief the pleader seeks").

The trial court found that Mr. Parker suffered a $6,000 deficit in income per month as a result of Mr. Clayton's conversion of the truck. Mr. Clayton does not dispute this finding. In addition to the return of his truck and personalty, Mr. Parker sought $50,000 in damages as of June 26, 2015, when the complaint was filed, as well as "such other relief he may be entitled to." Based on the $50,000 figure set forth in the complaint, we will limit to $50,000 the lost wages Mr. Parker is entitled to recover as of the time the complaint was filed.[6] We find, however, that Mr. Parker is entitled to recover $6,000 per month in lost wages for the following twenty-three months, which is approximately how much additional time passed before the case was tried. Thus, in addition to the $50,000 in lost wages specifically requested, we conclude that Mr. Parker is entitled to another $138,000 in lost wages ($6,000 x 23 = $138,000). Adding this amount to the remainder of the damages the trial court awarded, we conclude that Mr. Parker is entitled to recover the sum total of $215,200.99:

$188,000 — gross personal income for lost wages;
    20,000 — value of the truck;
     6,087 — value of Mr. Parker's personal property;
     1,113.99 – balance parties' financial responsibility based on their agreement to split income and expenses during training period;

    $215,200.99 TOTAL DAMAGES

---

[6]Mr. Parker requested the return of his truck and personalty, which together had a value of $26,087. Rather than order the return of these items, however, the trial court ordered Mr. Clayton to reimburse Mr. Parker for the value of these items. Adding these values to the $50,000 award Mr. Parker requested, we conclude that Mr. Parker's damages totaled $76,087 as of the filing of the complaint.

## IV. CONCLUSION

The trial court's judgment is affirmed as modified, as set forth above, and this matter is remanded with costs of appeal assessed against the appellant, William H. Clayton, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE